Leo M. and Genevieve B. RAYHILL, d/b/a
Leo M. Rayhill Company,

v.

The UNITED STATES.

No. 21–62.

United States Court of Claims.

July 15, 1966.

Joseph J. Lyman, Washington, D. C., attorney of record, for plaintiff.

Mitchell Samuelson, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Richard M. Roberts, Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Herbert N. Maletz with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on March 25, 1965. Exceptions to the commissioner's opinion and report were filed by defendant and the case was submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion and recommendation of the commissioner, with slight modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. This case is very near to Illinois Tri-Seal Products, Inc. v. United States, 353 F.2d 216, 173 Ct.Cl. —— (Nov.1965). It differs from *Illinois Tri-Seal* in some respects—including the fact that the applicators here did not pay their own employment taxes—but we think that these differences, though they may make this a closer case than *Illinois Tri-Seal,* are insufficient to call for a decision different from that in *Illinois Tri-Seal.* The major patterns of the work relationships are too much alike. Plaintiff is therefore entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).

Commissioner Maletz' opinion[*], as modified by the court, is as follows:

Plaintiff has brought this action to recover federal insurance contributions and unemployment taxes alleged to have been erroneously paid for the period from January 1, 1959 through March 31, 1960 on the earnings of certain workers known as "applicators". The single issue presented is whether during that period such applicators were "employees" of plaintiff within the meaning of sections 3121(d) (2) and 3306(i) of the Internal Revenue Code of 1954 (26 U.S.C. §§ 3121 (d) (2), 3306(i) (1958 ed.)), both of which "specifically adopt the common-law test for ascertaining the existence of the employer-employee relationship." Enochs v. Williams Packing Co., 370 U.S. 1, 3, 82 S.Ct. 1125, 1127, 8 L.Ed.2d 292 (1962). Section 3121(d) provides in part:

For purposes of this chapter, the term "employee" means—

(1) any officer of a corporation; or

(2) any individual who, under the usual common law rules applicable in determining the employer-employee re-

[*] The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

lationship, has the status of an employee; or[1]

\* \* \* \* \* \*

Section 3306(i) reads:

For purposes of this chapter, the term "employee" includes an officer of a corporation, but such term does not include—

(1) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an independent contractor, or

(2) any individual (except an officer of a corporation) who is not an employee under such common law rules.[2]

Plaintiff, a partnership, maintained a regular office in Syracuse, New York, where it engaged in the home-improvement business which consists of selling to homeowners and applying to their houses such structural materials as roofing and siding. Plaintiff's salesmen (who were held to be independent contractors by the District Director of Internal Revenue) obtained written contracts on its behalf from property owners for the sale and installation of the materials, which contracts contained a general description of the improvements to be made; an agreed price for labor and materials; plaintiff's promise to furnish good quality material and to perform all labor in a good workmanlike manner; and a statement by plaintiff that it was fully protected with public liability, property damage and workmen's compensation insurance.

The individuals who performed the labor under these contracts by applying the roofing and siding materials to the homes of plaintiff's customers were called "applicators". They did not maintain an office, advertise in the newspapers or telephone directory, or have their own business cards. Plaintiff acquired the services of applicators by several different methods. Ordinarily it obtained the names of qualified applicators from its wholesale materials supplier; it also had the names of several qualified applicators upon whom it could call to perform a contract job. In some instances, plaintiff's competitors referred applicators to it; on occasion, applicators came to plaintiff's office seeking work; and at times plaintiff advertised in the "Help Wanted" section of the newspapers for applicators.

When a particular contract job was ready, the applicator was proffered a work sheet which contained the name and address of the property owner where the work was to be performed; a general description of the work; an approximation of the number of squares of roofing or siding material to be applied; and the kind, size, type and color of material to be used, and where to apply it. Some work sheets also specified the number of coats of paint to be applied, and the kind and size of the molding to be used. Also, on occasion, a work sheet contained a notation as to when a job was to be started. In the event a particular job was an unusual one, that fact, as well, was usually noted on the work sheet.

Plaintiff proffered work sheets only to experienced applicators who were deemed capable of performing the work but there was no bidding among the applicators for the work sheets. Each applicator was free to accept or reject any job and frequently an applicator rejected a job. Despite this, he was still offered further application work by plaintiff. On many occasions, an applicator, when proffered a work sheet, went out and examined the work premises before advis-

---

1. Succeeding subsections include under the coverage of the Act as employees persons engaged in a variety of occupations (none of which are relevant here), such as agents or commission drivers distributing specified products, full-time life insurance salesmen, certain homemakers and traveling salesmen. Applicators were not thus included.

2. The legislative history of these provisions is considered in Illinois Tri-Seal Products, Inc., et al. v. United States, 353 F.2d 216, 224–228, 173 Ct.Cl. ——, —— - —— (1965).

ing plaintiff as to whether or not he would take the job.

Contract materials, such as roofing and siding materials, were furnished by plaintiff who had them delivered to the job site. The applicators provided their own tools which usually consisted of ladders, planks, hammers, material cutters, pump jacks and small tools, which in the aggregate cost new from $100.00 to $400.00. They also provided their own station wagons or trucks for transportation of themselves and their equipment to and from the various job sites, and paid all the expenses for the upkeep and maintenance of their equipment and vehicles without accounting to or obtaining reimbursement from plaintiff. Each job was a separate and distinct undertaking between the plaintiff and the applicator, and a separate work sheet was furnished the applicator for each job. Neither plaintiff nor the applicator was obligated to offer or accept another job. The applicators were generally paid by the job and not on the basis of any hourly, daily, weekly or other periodic rate. More particularly, the applicators were generally paid on the basis of a prevailing piecework rate for each square of roofing and siding applied and, consequently, there were no price negotiations between the plaintiff and the applicators except where extra work incident to the job was required. Payment was due at the completion of a job, but the practice was to pay the applicators on Friday for work completed in that week. However, the applicators could and frequently did obtain payment for completed jobs at other times during the week simply upon request.

It was understood that the applicator would start work on a job as soon as he had finished the work with which he was then occupied and that he would complete the job within a reasonable time. The applicators, however, had no specified working hours; rather, each applicator determined his own hours of work, the length of time that he worked, and the amount of time he would take off.

The applicator worked either alone or with an associate applicator of his own choosing. The compensation paid for a job was divided between associate applicators in accordance with the arrangement between them, and the plaintiff did not participate in such arrangement. The applicator was free to and did employ helpers of his own choosing without the approval of the plaintiff and determined the helpers' pay, hours and working conditions without interference by plaintiff. A helper was paid directly by the plaintiff in an amount specified by the applicator, the plaintiff having no voice in the amount of compensation the helper received. The amount the plaintiff paid a helper was taken from the amount of compensation due from the plaintiff to the applicator on the specific job on which the helper was employed.

All work was done away from plaintiff's premises. The plaintiff had no supervisors or other personnel to observe, instruct or direct the applicators as the work progressed and did not undertake to supervise the work of the applicators, although the partner in charge of plaintiff's Syracuse office occasionally visited a job to see if it was being performed in accordance with the terms of the contract. Other than being expected to comply with the requirements set forth in the work sheets, the applicators received no instructions or directions from plaintiff as to the manner or method in which the work was to be done.

The applicators were free to and did on occasion contract directly with a customer of plaintiff for comparatively minor repair or alteration work not covered by the contract or work sheet, in which case the applicator was compensated directly by the customer without intervention by the plaintiff. However, in the event the additional work desired by the customer was of a major nature and was of a kind performed by plaintiff, it was understood that the applicator would notify the plaintiff who would send out a salesman to sell the job. Also, if the applicator, while performing a job for plaintiff received a lead on new work of a kind per-

formed by plaintiff, it was understood that he would turn the lead over to the plaintiff. Ordinarily, the applicator received no bonus or commission for reporting a lead, but on occasion received a token commission if the job was sold.

Since all applicating work was on a job-to-job basis, there was no understanding between the applicators and plaintiff that an applicator would get a definite number of jobs or that the applicator would perform a certain number of jobs. However, there were 7 or 8 "regulars" who could be looked to by plaintiff in assigning work sheets throughout the year and these "regulars" spent most of their time during the period in question in performing applicating jobs for plaintiff. In the intervals between doing such jobs, they performed similar work for other concerns. Ordinarily when the plaintiff had only one job available and several applicators including a "regular" sought a job, the plaintiff gave it to the "regular". The vast majority of applicators came and went; that is to say, they usually were given two or three jobs by the plaintiff, following which they performed jobs for plaintiff's competitors, and then returned to plaintiff's office seeking further jobs. There was no understanding that applicators would perform jobs in any certain sequence; this was a matter within the individual applicator's discretion. Between jobs for plaintiff, applicators were free not only to perform jobs for competitors of plaintiff but to perform jobs on their own account for homeowners, and some applicators did perform such contract work on their own account, while others did not seek such work.

After the applicator had completed a job and the work proved to be unsatisfactory, the applicator was required to go back and repair the work without additional compensation. Plaintiff never terminated his arrangement with an applicator during progress of a job. If not satisfied with the applicator's work, plaintiff refrained from offering him another work sheet. The applicator terminated or suspended his relationship with the plaintiff without notice by rejecting or failing to apply for another job.

The applicators were not members of any labor union and plaintiff's dealings with them were on an individual basis. Plaintiff had no agreement which entitled it to a preferred call on the time and services of the applicators.

On various occasions, plaintiff had signs placed at job sites which stated that it was doing the work; it also had public liability and property damage insurance coverage for accidents or damages caused by the work done by the applicators. In addition, the plaintiff was and is enrolled under and paid contributions in behalf of both the applicators and its salesmen to the Workmen's Compensation Program of the State of New York. The plaintiff also was originally enrolled under the New York State Unemployment Insurance Program with respect to the applicators. An application to the New York State Department of Labor resulted in a refund to the plaintiff of the contributions so paid as a result of a decision by that Department, after an administrative hearing, that the applicators were not employees within the meaning of the State statute.

Turning now to the applicable legal principles, it is, of course, fundamental that under the common-law test prescribed by the statutes in question, the presence or absence of an employer-employee relationship is largely determined by whether or not the person for whom the work is done has the right to control the manner and method of performing the work, as well as the result to be accomplished. See e. g., Illinois Tri-Seal Products, Inc., et al. v. United States, 353 F.2d 216, 223–224, 173 Ct.Cl. ——, —— – —— (1965), and cases there cited. Thus, an applicable Treasury regulation which is an "authoritative elaboration" of the common-law test (id. 353

F.2d p. 223, 173 Ct.Cl. p. ——) provides in part (26 CFR § 31.3121(d)—1):

*Who are employees.*

(a) * * *

(c) *Common Law Employees.* (1) Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.

(2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees. * * *

(3) Whether the relationship of employer and employee exists under the usual common law rules will in doubtful cases be determined upon an examination of the particular facts of each case.

The Congressional intent underlying the enactment of the statutes involved here calls for a realistic and nonrestrictive application of the common-law rules in order to ascertain the real substance of the arrangement. Illinois Tri-Seal Products, Inc. v. United States, supra, 353 F.2d at pp. 225–228, 173 Ct.Cl. at pp. —— - ——. This requires consideration of all pertinent factors in making the ultimate determination. Thus, in addition to the factors prescribed by the Treasury regulation, relevant to the determination are such factors as "degrees of control, opportunities for profit and loss, investment in facilities, permanency of relation and skill required * * *." United States v. Silk, 331 U.S. 704, 716, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947); Enochs v. Williams Packing Co., 370 U.S. 1, 3, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962); also relevant are the method of payment (whether by time or job), whether or not the work is part of the employer's regular business, and whether or not the parties believe they are creating an employer-employee relationship in the common-law sense. Restatement of the Law, Agency 2d § 220: "[N]o one factor is controlling nor are these factors exclusive. The relationship is to be ascertained by an over-all view of the entire situation, not by any rule of thumb, or by the presence or absence of a single factor. The result in each case must be governed by the special facts and circumstances of the case itself." Cape Shore Fish Co. v. United States, 330 F.2d 961, 965, 165 Ct.Cl. 630, 637 (1964). "It is the total situation that controls." Bartels v. Birmingham, 332 U.S. 126, 130, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947 (1947); Arthur Venneri Co. v. United States, 340 F.2d 337, 343, 169 Ct.Cl. 74, 83 (1965).

■ Against this background, and for the reasons set forth below, it is concluded on the basis of the total situation that plaintiff had the right under the arrangement to control only the result to be accomplished by the applicators and lacked the right to control the manner in which the work was to be performed. For here in summary the record shows the following: the applicators determined for themselves when they would work and their hours of work. They furnished their own tools and equipment for the performance of the work; provided their own station wagons or trucks for transportation of their tools and equipment to and from the various job sites; paid all expenses for upkeep and maintenance of their vehicles and equipment without accounting to or obtaining reimbursement from plaintiff; and had a not insubstantial investment in vehicles, tools and equipment. The applicators were free to work alone or with partners or associates of their own choosing who decided among themselves without any interference by the plaintiff the division of their compensation. Many hired helpers of their own choosing and determined their helpers' pay, hours and working conditions.

The applicators were experienced workers who possessed the ability to perform the work in accordance with the terms of the contract. They were not members of a labor union; they dealt with the plaintiff as individuals on a job-to-job basis, and between performing jobs for plaintiff they were free to and did in some instances compete directly with the plaintiff.[3] They were paid by the job rather than upon an hourly, daily, weekly, or other periodic rate. They could and did reject any proffered job in their own discretion without recrimination. Since each job was of comparatively short duration and the applicator was free to accept or reject the offer of a new job, "permanency of relationship

can hardly be said to exist or be a weighty element." Silver v. United States, 131 F.Supp. 209, 212 (N.D.N.Y. 1954); Illinois Tri-Seal Products, Inc. v. United States, supra, 353 F.2d at p. 229, 173 Ct.Cl. at pp. —— – ——.

All work was done away from plaintiff's premises and plaintiff never attempted to control or direct the manner in which the applicators did the work. Plaintiff had no foremen or supervisors to direct the applicators in the manner of doing the work. Other than being expected to follow work sheet requirements of a kind usually contained in contract specifications so that the job would be accomplished in accordance therewith, the applicators received no instructions or directions from plaintiff as to the manner in which the work was to be done.

■ In no instance was the work of an applicator terminated during its progress. If plaintiff was dissatisfied with the work, he would not offer the applicator another work order. The applicator, if dissatisfied, would decline the next job offered by the plaintiff. "This [of course,] is not the equivalent of evidence of a right to fire an applicator from a job once he had begun to work on it. It is only evidence of the right not to enter into another contract." United States v. Thorson, 282 F.2d 157, 164 (1st. Cir. 1960). See also Party Cab Co. v. United States, 172 F.2d 87, 93, 10 A.L.R. 2d 358 (7th Cir., 1949) cert. denied, 338 U.S. 818, 70 S.Ct. 62, 94 L.Ed. 496; American Homes of New England v. United States, 173 F.Supp. 857, 859 (D. Mass.1959); Silver v. United States, 131 F.Supp. 209, 212 (N.D.N.Y.1954); Jagolinzer v. United States, 150 F.Supp. 489, 492 (D.R.I., 1957).

■■ The fact that plaintiff's customers could sue plaintiff for the negligent acts of the applicators is not significant. Such liability is predicated on the

---

**3.** The fact that it was understood that the applicators would turn over to plaintiff leads on new jobs emanating from work performed for plaintiff and thus would

not compete with plaintiff for this business might have antitrust significance but would seem to have little bearing on the problem here.

doctrine of estoppel or a holding out, to the public, and this consideration is in no way determinative of the issue here. Magruder v. Yellow Cab of D. C., 141 F. 2d 324, 325, 152 A.L.R. 516 (4th Cir. 1944); Illinois Tri-Seal Products, Inc. v. United States, supra, 353 F.2d at p. 230, 173 Ct.Cl. at p. ——. And although relevant, it is not determinative that the applicators' work was an essential part of the plaintiff's regular business as is illustrated by the Internal Revenue Service's ruling that plaintiff's salesmen were not employees though they too were undoubtedly an equally essential part of the plaintiff's business.

■ The record, moreover, fails to establish that the parties believed that they were creating an employer-employee relationship in the common-law sense.[4] While the plaintiff was enrolled under and paid contributions on behalf of the applicators to the New York State workmen's compensation program, under the present interpretation of that State's law, the term "employees" for purpose of coverage encompasses not only common-law employees but also persons who meet the "relative nature of the work test".[5] Gordon v. New York Life Insurance Co., 300 N.Y. 652, 90 N.E.2d 898 (1950); Paly v. Lane Brush Co., 6 A.D.2d 50, 174 N.Y.S.2d 205 (1958). See also Larson Workmen's Compensation § 43.54.

Parenthetically it will be observed in this connection that plaintiff enrolled its salesmen under the State workmen's compensation program notwithstanding that they had been held not to be common-law employees for federal tax purposes. In short, because of the difference in concept between an "employee" for New York workmen's compensation purposes and an "employee" for federal tax purposes, plaintiff's enrollment of the applicators under the State workmen's compensation program cannot be considered an indication that it believed thereby that they were employees in the common-law sense. See Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan, 179 F.2d 882, 885 (8th Cir. 1950) cert. denied 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605; Conasauga River Lumber Co. v. Wade, 221 F.2d 312, 315 (6th Cir., 1955) cert. denied, 350 U.S. 949, 76 S.Ct. 324, 100 L.Ed. 827 (1956); Thor Company v. United States, 173 F.Supp. 65, 68–69 (D. Mass.1959), aff'd United States v. Thorson, 282 F.2d 157, 163 (1st Cir. 1960). Likewise, plaintiff's enrollment of the applicators under the New York Unemployment Insurance Program would seem to have little pertinence here. For one thing, refunds on the contributions thus made were sought and obtained on the ground that the applicators were not employees within the meaning of the State

4. "It is not determinative that the parties believe or disbelieve that the relation of master and servant exists, except insofar as such belief indicates an assumption of control by the one and submission to control by the other * * *." Restatement of the Law, Agency 2d, § 220, p. 492. See also Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547 (1947). The Restatement presents the following illustrations (ibid):

"10. A, employed by a taxi company, is sent by P, his employer, to drive B from X to Y, and it is agreed between A, P, and B that for the purposes of the trip A is to be B's servant, although B is to exercise no more control over A's conduct than is normal in the ordinary case of passengers in taxicabs. A is not B's servant.

"11. A is employed by P as resident cook for his household under an agree-

ment in which P promises that he will in no way interfere with A's conduct in preparing the food. A is P's servant."

5. This test consists of an analysis of the facts to establish (1) the character of the person's work; (2) the extent to which the worker is engaged in a separate calling; (3) how continuous or intermittent the work is; (4) whether the work is temporary or permanent; (5) the importance of the work to the employer's business; and (6) the character of the relation to determine whether or not the particular employment should carry its own accident burden. The existence or absence of an employment relationship may be determined on the basis of these factors without regard to whether or not the principal has the right to control the manner and method of the work being done. See Paly v. Lane Brush Co., 6 A.D.2d 50, 174 N.Y.S.2d 205 (1958).

statute. For another, the plaintiff "may have believed it safer to provide such coverage to protect [itself] in case the applicators might sometime be held to be employees. * * * The sole issue here is whether these applicators were employees within the meaning of the pertinent Federal tax statutes. This question cannot be determined by whether or not they were employees within the meaning of a state workmen's compensation law or [a state unemployment statute] * * * Much less is it determined by what plaintiffs rightly or wrongly may have thought the status of the applicators was under such a state statute. * * * " Thor Company v. United States, supra, p. 69.[6]

 Nor in the circumstances of this case can an intent to create an employer-employee relationship be inferred from the fact without more that plaintiff withheld from, and paid the appropriate federal taxes on, the earnings of the applicators. Failure to have made such withholdings and payments might have subjected it to assessments and penalties (see e. g., Illinois Tri-Seal Products, Inc., supra, 353 F.2d at p. 219, 173 Ct.Cl. at p. ——), and to possible criminal sanctions. See 26 U.S.C. § 7202 (1958 ed.). Then, too, the plaintiff could not have challenged a deficiency in the Tax Court[7] or had reasonable prospect of obtaining an injunction to restrain enforcement of the tax. Enochs v. Williams Packing Co., 370 U.S. 1, 82 S.Ct. 1125 (1962). One need not resort to martyrdom to obtain judicial determination of the issue here. To suggest that the plaintiff should not have paid the tax if it believed that the applicators were not common-law employees would be to approve snares and traps for the unwary. In addition, the payment of the tax was a jurisdictional prerequisite to the filing of this suit. It would be an unusual law which first required the payment of a tax as a jurisdictional prerequisite to the filing of a suit for its refund and then permit its payment to be a ground for a defense against the claim.

 Reference is made by defendant to terminology used by plaintiff in newspaper advertisements, insurance policies and the like to demonstrate that plaintiff conveyed the impression that applicators were employees. In addition to the fact that the term "employees" was not used, there is nothing in the record to indicate that plaintiff had in mind "common-law employees" as distinguished from those who may be considered employees for compensation purposes under State law or that plaintiff intended to convey the impression that it was hiring common-law employees as opposed to workers classified generally as employees for other purposes. And even if plaintiff did convey such impression, the terminology would be of much less consequence as compared to the actual facts of the relationship. Bartels v. Birmingham, supra. See also footnote 4, supra. Also, the presence of plaintiff's signs at the job sites and the absence there of applicators' signs are "largely beside the point". Millard's Inc. v. United States, 146 F.Supp. 385, 388 (D.N.J.1956). For it is not usual for subcontractors and persons who fall into a category less than that of a "contractor" to place job signs on the job site where they are doing work and labor. Sometimes subcontractors will place their own signs at the work site but their absence does not make them any less a subcontractor. Largely beside the point too, given the other considera-

---

6. In Edwards v. United States, 168 F. Supp. 955, 958–959, 144 Ct.Cl. 158, 165 (1958) the government made a contention similar to one it makes here that the fact that the plaintiff was enrolled under and paid contributions to the State industrial and unemployment programs had a bearing on the employee status of the applicator. This court pointed out that "Following the view in Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan, 8 Cir., 179 F.2d 882, we feel that fact is not decisive in view of the whole situation herein presented." (ibid.)

7. The Tax Court is without jurisdiction in respect of FICA and FUTA taxes; its jurisdiction generally is limited to income, estate and gift taxes. See 26 U.S.C. § 7442 (1958 ed.).

tions present here, is the fact that the applicators had no business cards and did not advertise to the public. Thus, the Internal Revenue Service has held that artisans were not employees for tax purposes although they were paid by the hour and did not advertise their services to the public in any manner. See Rev. Rul. 55–582, 1955–2 CB 403; Rev.Rul. 57–63, 1957–1 CB 321, 322. See also Party Cab Co. v. United States, 172 F.2d 87, 92 (7th Cir. 1949), cert. denied, 338 U.S. 818, 70 S.Ct. 62.

In sum, the applicators were not, during the period involved, plaintiff's employees within the meaning of the federal statutes in question.[8] Plaintiff is, therefore, entitled to judgment for the period in issue.

---

8. This conclusion coincides with that previously reached by this court on the basis of facts that were virtually identical with those present here. Edwards v. United States, 144 Ct.Cl. 158, 168 F.Supp. 955 (1958). The conclusion is also in harmony with that reached by a number of other courts which likewise held that the applicators there involved—who worked under essentially similar arrangements to those described here—were not employees for federal tax purposes. See cases cited in Illinois Tri-Seal Products, Inc. v. United States, supra, slip op. pp. 22–24, 353 F.2d at pp. 231–32.