**Bernhard R. KURIO, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**No. 66–H–509.**

United States District Court
S. D. Texas,
Houston Division.

March 5, 1968.

Robert I. White, of Chamberlain & Hrdlicka, Houston, Tex., for plaintiff.

Leonard B. Tatar, Tax Division, U. S. Department of Justice, for defendant.

## MEMORANDUM AND ORDER

NOEL, District Judge.

This is a suit for the refund of taxes, commonly referred to as payroll taxes, paid in the amount of $44.90 for the year 1963 and $161.22 for the year 1964. Plaintiff alleges such taxes to have been erroneously assessed pursuant to the

Federal Insurance Contributions Act (FICA), 26 U.S.C. § 3101 et seq., the Federal Unemployment Tax Act (FUTA), 26 U.S.C. § 3301 et seq., and the collection of income tax at the source on wages (withholding or WH tax), 26 U.S.C. § 3401 et seq.[1] The United States filed a counterclaim demanding judgment (a) for FICA, FUTA, and withholding taxes assessed by the District Director of Internal Revenue for the quarters and years 1963 and 1964 which have not been paid by the plaintiff, (b) for additions to taxes (penalties) pursuant to 26 U.S.C. § 6651(a) for failure to file timely payroll tax returns and § 6656 for failure to make deposits of taxes, and (c) for interest thereon. The amount of the counterclaim is $89,063.56. In the alternative, the United States seeks judgment for the amount of $4,200, in addition to payments and credits of $8,188.41, alleged to be owing pursuant to a contract of settlement entered into between plaintiff and defendant with respect to the assessments here in issue.

On this day I have entered an Order Directing Entry of Final Judgment with respect to plaintiff's claimed liability for FICA, FUTA, and withholding (WH) taxes and additions to taxes for the years 1963 and 1964, pursuant to rule 54(b) of the Federal Rules of Civil Procedure. The issue as to whether a valid and binding contract of settlement was entered into by the parties has been severed for later determination. It is in the interest of the administration of justice that the order of severance has been entered, and there is no just reason for the delay of judgment in the issues disposed of in this Memorandum and Order.

During 1963 and 1964, Plaintiff Kurio was a contractor who subcontracted drywall work or construction from house and apartment builders. Kurio furnished materials for the construction work so contracted, but arranged with others to haul or truck the materials to the jobs, with workmen known as hangers, tapers, floaters and sanders to actually fabricate the materials into walls, and with others to clean up and haul or truck trash from the jobs after completion of his drywall construction on the jobs. On rare occasions Kurio contracted to perform drywall repair work, including minor painting, all of which he arranged to be done by workmen of the kind and in the manner next above mentioned.

The FICA, FUTA, and withholding taxes were assessed against Kurio on the theory that all of the persons who hung, taped, floated and sanded drywall board (commonly referred to both as sheetrock and as gypsum board), persons who trucked or hauled the drywall construction materials to the jobs, persons who did painting on the jobs, and persons who hauled or trucked trash away from the jobs for the plaintiff during 1963 and 1964 were his employees for payroll tax purposes under 26 U.S.C. §§ 3121(d), 3306(i), and 3401(c) and (d), Internal Revenue Code of 1954. It is the plaintiff's contention that the workmen were not his employees for payroll tax purposes, but were self-employed subcontractors (independent contractors) and, therefore, that he was exempt from the obligations imposed upon employers by sections 3121, 3306 and 3401 et seq.

On October 27, 1965, an agent from the Houston Office of the Internal Revenue Service (IRS) reviewed Kurio's

---

1. 26 U.S.C. § 3101 imposes upon the income of every individual a tax equal to specified percentages of wages he rereceives with respect to employment, as defined by section 3121(b), as a contribution to his insurance under Social Security and related programs (FICA). 26 U.S.C. § 3102 imposes upon the "employer" the duty to collect this tax by deducting the appropriate amount from the employee's wages when paid.

26 U.S.C. § 3301 imposes upon every employer an excise tax with respect to individuals in his employ equal to 3.35 percent of the total wages paid by him during the calendar year with respect to employment (FUTA). 26 U.S.C. § 3402 provides for the collection of income tax at the source by requiring every employer to deduct and withhold a percentage of the wages paid to employees (withholding tax).

books. This was done as part of a test check of the drywall construction industry, in an effort affirmatively to bring under the classification of employees for payroll tax purposes, certain drywall industry workmen who theretofore had been reported to the I.R.S. as subcontractors without challenge by the I.R.S. In the report of his review, the agent treated payments made by Kurio to drywall hangers, tapers, floaters and sanders, as well as the materials truckers, trash haulers and incidental painters, during 1963 and 1964, as "wages" paid "employees." On November 19, 1965, the agent prepared a formal Preliminary Statement [2] of delinquent FICA, FUTA and WH taxes due for 1963 and 1964, together with penalties for late filing without reasonable cause and for failure to make monthly deposits without reasonable cause, imposed pursuant to sections 6651(a) and 6656, respectively. The statement related that the reason Kurio did not report and pay payroll taxes was that he considered the people to whom such payments were made to be subcontractors. The Preliminary Statement and supporting forms were sent to the District Director, U. S. Treasury Department, Internal Revenue Service at Austin, Texas.[3]

On December 29, 1965, the District Director addressed a letter to Kurio advising him of the proposed adjustments to his tax liability for 1963 and 1964. The Director advised that Kurio had three alternatives available: he could accept the adjustment, or if he did not accept, he could either request a conference with a member of the District Conference Staff, or request a hearing with the Appellate Division of the Regional Commissioner's Office. On January 28, 1966, Kurio's counsel mailed a protest letter to the District Director, whereby Kurio took exception to the findings of the agent. A hearing before the Appellate Division of the Regional Commissioner's Office in Houston was requested.

A hearing conference was held in the Houston office on March 15, 1966. Kurio's counsel presented the facts and authority relied upon to support his position. Kurio's evidence included statements [4] signed by various of the drywall workers under penalty of perjury, wherein the workers said that they had filed their own income tax returns for the tax periods in question, including the payments received from Kurio, and that Kurio had withheld no income tax from the money they had earned from him. Kurio's protest and exception were denied, which ended his appellate rights before the IRS.

 The District Director assessed the tax,[5] placed Kurio's name on an assessment list and forwarded the list to the Houston office for collection. The Kurio account was assigned to a revenue officer, commonly referred to as a collec-

---

2. Form 2502, U.S. Treasury Department, Internal Revenue Service, "Preliminary Statement—Excise or Employment Tax."

3. Supporting Forms 2496, 2501 and 2498 were made a part of Amundsen's Preliminary Statement, 5 pages in all.

4. These statements were submitted on U. S. Treasury Department, Internal Revenue Service Form 727, promulgated for the express purpose "To support an employee's claim for abatement of a withholding tax assessment." Twenty-three such statements were introduced into evidence at the trial of this case.

5. The FUTA taxes for 1963 and 1964 were assessed on July 15, 1966; the FICA and withholding taxes for 1963 were assessed on June 10 and 17 of 1966; and the FICA and withholding taxes for 1964 were assessed on July 1, 1966. An assessment, which is an administrative determination of tax liability, is made by recording the liability in the office of the District Director. 26 U.S.C. § 6203. The assessment is given the force of a judgment, and if not timely paid, authorizes administrative officials to seize the debtor's property to satisfy the debt. Bull v. United States, 295 U.S. 247, 260, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). The assessment establishes a *prima facie* case of liability and nothing more. United States v. Lease, 346 F.2d 696, 698 (2d Cir. 1965).

tion officer, for application of collection procedures.

■ Kurio paid a portion of the assessment [6] and filed with the District Director's Office, a claim for refund of taxes illegally, erroneously, or excessively collected.

■ A notice of the assessment was mailed to Kurio. Upon his failure to pay the assessment within the allowed time period, the collection officer prepared a notice of lien in the approximate amount of $89,000 and caused it to be filed in the Federal Lien Records in Harris County, Texas, on August 8, 1966.[7] Seizure of Kurio's assets by the collection officer has been held in abeyance administratively, pending the outcome of this proceeding.

Kurio's claim for refund was rejected by the District Director, following which this suit for refund was filed.[8] The United States filed a counterclaim herein for the balance of the assessment in the stated amount of $89,063.56. Subsequently, plaintiff Kurio was able to convince the IRS that a number of the people treated by it as "employees," had reported the amounts received from Kurio on Schedule C of their own federal income tax returns as self-employment income, and with respect thereto had paid their self-employment taxes.[9] 26 U.S.C. sections 1401 and 1017. This resulted in a substantial abatement of withholding taxes by the IRS and a subsequent stipulation by counsel of the maximum liability of plaintiff for 1963 and 1964 FICA, FUTA, and WH taxes to be $25,629.48. Despite the fact that the maximum liability has been so reduced, the lien recorded to notice the liability continues to voice the original assessment as the amount of taxes due.

Plaintiff is a young businessman, 29 years of age, who now resides in Houston, but came here from the small town of Giddings, Texas in 1957. Between 1957 and 1963, he sub-contracted work from certain drywall construction contractors, as a drywall board hanger, taper and/or floater. In 1963 plaintiff decided to become a drywall construction contractor himself. He made contact with various home and apartment builders [10] in and around the Houston area and sought to sub-contract their drywall construction work. Thereafter, builders would invite plaintiff to make bids on their apartment and residential projects. Upon receipt of each such invitation to bid, Kurio would compute the square footage of wall to be constructed and estimate his costs of doing the job, including a satisfactory margin of profit for himself. Having done so, he would submit his bid or price for doing the job to the builder.

6. Absent unusual circumstances, all or part of this type of assessment must be paid before the district court will have jurisdiction of the claim. See Poretto v. Usry, 295 F.2d 499 (5th Cir. 1961). This is to be contrasted with the procedure by which income, estate, or gift taxes are assessed, where the taxpayer has the opportunity to litigate the merits of the Government's claim in the Tax Court before payment of all or part of the claim. The assessment is held in abeyance during this period. 26 U.S.C. §§ 6212–6213; Treas.Reg. § 601.103.

7. The lien comes into existence on the date the assessment is made. 26 U.S.C. § 6322. The notice of lien was filed in accordance with 26 U.S.C. § 6323(f) (1) and Vernon's Tex.Rev.Civ.Stat.Ann. art. 6644.

8. Jurisdiction is conferred upon this court by 28 U.S.C. § 1346(a) (1).

9. This came as the result of examining all the 1963 and 1964 returns of the alleged "employees" of Kurio that were furnished by the Internal Revenue Service at plaintiff's request. Numerous returns of persons who received payments from Kurio, upon which payroll taxes were assessed, although requested and sought to be discovered by Kurio, were not produced by the Service.

10. People who for the most part build for their own account rather than by contract for others are commonly referred to as builders but here they are the equivalent of construction contractors.

In the drywall construction business, the workmen bear titles which are descriptive of the work they do.

A "hanger" is one who puts the drywall board or sheetrock in position on the walls and ceiling. A "taper" fills in the joints or gaps between the pieces of drywall with "mud" and covers the cracks to keep the mud from cracking. A "floater" coats the wall with a substance to give the drywall the appearance of being one piece of installation, having the appearance of a plaster wall. A "sander" rubs the drywall with sandpaper so as to give it a smooth surface.

In Kurio's operations, some hangers would do taping work, and some tapers would do floating work. Normally, however, one person would do only one phase of the drywall work (hang, tape, float or sand). Each phase was functionally and chronologically separate from the other phases.

Drywall hangers generally work in teams of three or four persons, with one man being in charge of the team, while the tapers, floaters, and sanders generally work alone or in pairs.

When one of Kurio's bids or estimates was accepted and he was awarded the job or work, he would attempt by telephone to locate a hanger team leader, a taper, a floater and a sander who would be willing to perform the specific job or work. Plaintiff would often know the availability of such workers from their telephone or personal calls to him for work. Plaintiff would negotiate separately with the hanger team leader, the floater, the taper and the sander, and would arrive at a price for the portion of the job or work which came within his particular trade or skill and therefore, to be performed by him. In all cases the price finally arranged was related to the number of square feet of drywall in the job, although the price per square foot might fluctuate from time to time depending on the difficulty or peculiar characteristics of the particular job. It was a part of plaintiff's agreement with the hangers, tapers, floaters and sanders that they would furnish their own tools and vehicles.

Once a net contract was set by plaintiff, he neither determined nor had the right to determine the particular person or workman who would perform the hanging, taping, floating and sanding work contracted to be done. Neither did plaintiff control nor have the right to control the hours the workmen worked, when they did the work, how many days a week they worked, how many hours a day they worked, how they went about doing the work, or anything regarding the actual manner and means of accomplishing their work. The workmen planned and attended to all of the details regarding the manner and means of accomplishing their work. As each worker performed his phase of the drywall on a particular job, he considered the job concluded from his standpoint, would leave the job, and not return. If there were any flaws in the work, plaintiff normally would make the corrections himself, because it was extremely difficult to get the workmen to return to a job for that purpose.

The hangers, tapers, floaters and sanders regarded themselves as self-employed subcontractors, and they were regarded as such by Kurio. The evidence reflects that a substantial number of the hangers, tapers, floaters and sanders (a) filed their own individual income tax returns for the years 1963 and 1964 and reported therein the amounts received from plaintiff as self-employment income on a Schedule C "Profit (or Loss) from Business or Profession—(Sole Proprietorships)," (b) reported the amounts they received from plaintiff as self-employment income on their own self-employment tax returns, and (c) paid their own individual income tax and their own individual self-employment tax on the amounts so received during the years 1963 and 1964.

For example, Ross Webb, a floater, testified that he normally worked alone, furnishing his own tools and transporta-

tion. He stated that he alone controlled the details of his work—that Kurio had no say about the details of his work, but looked only to the finished product. Webb reported the amounts he earned as a floater during 1964 on his own Schedule C and paid his own self-employment tax. He stated that of the $6,341.-81 he reported on Schedule C, only $1,970.07 was received from Kurio; the difference representing the amount he received from drywall contractors other than Kurio.

Incident to the hanging, floating, and taping procedures hereinabove described, it was necessary for plaintiff to arrange to have the drywall materials hauled to the job sites. When it was necessary to accomplish the delivery of materials, plaintiff would call a hauler with whom he was acquainted. If the hauler first called were unavailable, plaintiff would call another, and this process would be continued until he found a hauler who was available; then the price arrangements were negotiated. If the hauler was not familiar with the location of the job, he would normally take a look at the site to determine whether the delivery was going to be a "rough" (i. e. difficult or irregular) task. The difficulty of the hauling task varied with distance to the job, access to the job and the distribution of the drywall board within the building or buildings involved. Each hauler had his own truck, as well as his own helpers whom he paid.

After the parties reached agreement as to terms for each hauling job, the trucker would deliver the drywall to the site designated by Kurio, and place it inside the dwelling or apartment house. Customarily, no time was set for making the delivery, but the trucker was expected to have the drywall at the designated location within a few days, depending upon the number of jobs he had ahead of Kurio. Once the drywall was delivered, the trucker, having completed the job for Kurio, would leave for another job.

None of the truckers who received payments from Kurio worked full time for Kurio. All of them performed trucking services for other persons in and around the Houston community. All of the truckers controlled their own hours of work and who actually did the work involved in the trucking. Plaintiff neither controlled nor had the right to control the manner or means by which the truckers performed their work.

One of the truckers, U. N. Jordan, testified on behalf of the plaintiff. Jordan stated that during 1964 he operated under the trade name of Jordan Hauling Contractor, owned his own trucks and hired his own crew of helpers. Jordan reported earnings from his business of $54,428 in 1964 on his own Schedule C and paid his own self-employment tax. only $1,687.91 of his total earnings during 1964 came from work he had done for Kurio. He stated that his largest expense of operation was labor, which in 1964 amounted to $34,680.

Another class of people receiving payments from plaintiff during 1963 and 1964 were those who hauled trash from the jobs, hereinafter referred to as trash haulers. Occasionally, Kurio's contract with the person for whom the drywall work was being done would include cleaning up the premises and removal of the trash. On such occasions Kurio would telephone one of the trash haulers with whom he was acquainted to get a price for the cleaning and hauling work. The hauler in most instances would take a look at the job to see if it would be difficult, or in the vernacular of the trade, "rough." In all instances the hauler would quote plaintiff a flat charge "by the load," which meant by the truckload. If plaintiff thought the price quoted by the hauler too high, he would find another hauler to do the job, whose price was acceptable.

Sometimes the trash haulers worked alone, and sometimes they brought helpers who worked for and were paid by the haulers. None of the trash haulers worked for plaintiff exclusively. They

hauled trash for other drywall contractors, as well as for the general public. Plaintiff did not control nor did he have the right to control the trash haulers' hours of work or how they went about doing their work. The trash haulers themselves, controlled the manner and means by which the cleaning and hauling away operations were accomplished. Kurio did not furnish tools or trucks for the trash hauling operations.

In accomplishing the jobs Kurio was awarded, he looked to the hangers, tapers, floaters and sanders only for results; that is, a job completed and concluded in a workmanlike and satisfactory fashion. Kurio was seldom at the job site while the drywall work was being done. Likewise, he looked only to the truckers for results in the delivery of the materials; only to the trash haulers for results in cleaning up and removing the trash.

On many occasions a leader who had contracted to perform hanging work would instruct plaintiff to give him two or three checks in specified amounts, payable to different individuals but with whom plaintiff had not contracted and in many cases did not even know. On other occasions plaintiff would make full payment to the hanger to whom he contracted the particular hanging work, and the hanger would handle the paying of the people engaged by him to perform, or assist him in performing, the work. Traugott Teinert, a hanger crew chief who contracted work from plaintiff, testified that he paid his own crew with his own payroll checks.

██ Plaintiff gave all the persons performing the trucking, hanging, taping, floating and sanding work Forms 1099 "U. S. Information Return for Calendar Year" for the years 1963 and 1964, respecting the amounts he had paid to them during such years.[11]

On rare occasions, plaintiff was awarded a job that required certain painting work be done in addition to the installation of drywall. This occurred most often on the repair jobs. On such occasions, plaintiff would contract the painting work to a painter. Here, as with the other drywall workers, the painters either did the work themselves or arranged with others to actually do the painting. The painters with whom plaintiff contracted were responsible for completion of the painting work. The painting was done on a per-job basis, the cost of which related to the size of the surface to be painted. Plaintiff looked to these painters only for results; that is, a paint job done in a good and workmanlike fashion. He did not control the manner and means whereby the work was done. These were controlled by the painters themselves.

Because of the difficulty plaintiff had in contracting and making arrangements with the hangers, tapers, floaters and sanders, and particularly because of his inability to control how and when they performed the work, Kurio changed his mode of operation, effective in January, 1965. Since January, 1965, plaintiff has employed workers of the kind next above enumerated on an hourly basis, has required that they report to his place of business, and himself or through other people who work for him, has controlled the manner and means by which the work is performed. Since the time of this change in the mode of his operations, Kurio has been withholding payroll taxes and regularly remitting such taxes to the government. This change occurred more than a year before Agent Amundsen appeared at Kurio's place of business for the purpose of making the examination which preceded assessment of the 1963 and 1964 taxes and penalties here in controversy. Kurio made the change in the method of conducting his business

---

11. Every person who makes payments of income to an owner-employee under a self-employed retirement plan aggregating $10 or more for each class of income, and every person engaged in a trade or business who makes payments of $600 or more must file a Form 1099. No report on Form 1099 is required for wages and other compensation reported on Form W–2.

for practical business reasons, which bore no relation whatever to any possible tax liability of the kind here asserted against him by the I.R.S.

The issue for determination is whether under the facts and circumstances of this case the persons who hung drywall board and taped, floated, and sanded the board after it was hung, who trucked or hauled the raw materials to the job sites, who cleaned up and hauled trash away from the job sites, and who painted drywall for the plaintiff, all during the years 1963 and 1964, were his employees or self-employed subcontractors (independent contractors). This issue is to be resolved by following the guidelines established by statute, Treasury Regulations, and case law.

With respect to FICA taxes, section 3121(d), 26 U.S.C., defines "employee" for purposes of the chapter to mean: "(1) any officer of a corporation; or (2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee * * *.". With respect to FUTA taxes, section 3306(i) defines "employee" for purposes of that chapter to include "an officer of a corporation, but such term does not include—(1) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an independent contractor, or (2) any individual (except an officer of a corporation) who is not an employee under such common law rules." And with respect to withholding taxes, section 3401(a) defines "wages" for purposes of the act to include all remuneration for services performed by an employee for his employer.

The courts have construed the statutory guidelines to require the application of the common-law rules, realistically construed; not a hard and fast rule, but a realistic interpretation of the "employee" connotation. See Illinois Tri-Seal Products, Inc. v. United States, 353 F.2d 216, 223–229, 173 Ct.Cl. 499 (1965); Texas Carbonate Co. v. Phinney, 307 F.2d 289 (5th Cir. 1962).

■ Various guidelines have been developed by the courts for use in determining whether a particular relationship is that of employer-employee within the meaning of 26 U.S.C. §§ 3121(d) and 3306(i) and, for our purpose, § 3401. Relevant factors are: degree of control, opportunity for profit or loss, investment in facilities, permanency of relationship and length of employment, degree of skill required for the work and amount of skill involved in the work, method of payment, and how the parties themselves view their relationship. United States v. Silk, 331 U.S. 704, 716, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); Kirkconnell & Godfrey v. United States, 347 F.2d 260, 265 (Ct.Cl.1965).

■■ While no one factor is controlling and the entire circumstances must be viewed in determining if a person is an employee, the single most important factor is the degree of control exercised by the taxpayer. The *right* to control is the fulcrum. It may be defined as the right to control the persons performing the services, not only as to the result sought to be accomplished, but also as to the details and means by which the result is achieved, i. e. not only control as to what is to be done, but also as to how and when it is to be done. Lifetime Siding, Inc. v. United States, 359 F.2d 657, 660 (2d Cir.), cert. denied, 385 U.S. 921, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966).

Treasury Regulation section 31.3121 (d)–1(c) (2), pursuant to which the IRS makes its determination as to who are and who are not employees for FICA tax purposes, states that the following elements are to be considered in determining whether there is an employer-employee relationship: the right to control the result and the details and means by which the result is accomplished, the right to discharge, and the furnishing of tools and a place to work to the person who performs the work. The section continues to provide:

In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the

means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules. *Individuals such as * * * construction contractors * * * engaged in the pursuit of an independent trade, business, or profession, in which they offered their services to the public, are independent contractors and not employees.* (Emphasis added.)

Treasury Regulation section 31.3306(i)–1 concerning FUTA taxes and section 31.3401(c)–1 concerning withholding taxes follow the language of section 31.-3121(d)–1(c) promulgated for FICA taxes, almost verbatim.

■ The determination by the District Director that an assessment of taxes should be made is *prima facie* correct, and the burden is upon the taxpayer to prove that the assessment is erroneous. 26 U.S.C. § 7422(e). See Trippett v. Commissioner of Internal Revenue, 118 F.2d 764, 765 (5th Cir.), cert. denied, 314 U.S. 644, 62 S.Ct. 85, 86 L.Ed. 517 (1941). Thus, in a suit to recover FUTA, FICA and withholding taxes, the burden is on the taxpayer to establish that the relationship of employer-employee did not exist. Beatty v. Halpin, 267 F.2d 561, 564 (8th Cir. 1959). With respect to the issue here for determination, the Government relies solely upon this presumption. Counsel for the Government elected not to offer any evidence, other than the assessments themselves, that the drywall workers, haulers and painters were Kurio's employees. Government counsel did not cross-examine the witnesses who testified in support of plaintiff's position that the drywall workers, haulers and painters were independent contractors. And furthermore, in oral argument Government counsel did not even attempt to refute or reply to plaintiff counsel's argument on this issue.

■ It must be remembered that the presumption of correctness of the assessment of the tax is a rebuttable presumption. It is not a conclusive presumption. The presumption of correctness may be rebutted by the taxpayer. United States v. Rindskoph, 105 U.S. 418, 26 L.Ed. 1131 (1882); United States v. Lease, 346 F.2d 696 (2nd Cir. 1965); Miller v. United States, 296 F.2d 457, 460 (7th Cir. 1961). In fact, "a strong enough showing [by the taxpayer] will induce a prudent Government attorney to back up the assessment with the basis on which it was made, so that the factual determination may be resolved by the fact finder." United States v. Lease, supra, 346 F.2d at 700. While the Government has not offered such assistance to the Court in this case, I am satisfied that the relevant facts have been fully developed.

■ I find that Kurio neither had the right to exercise, nor exercised, a degree of control over the drywall workers sufficient to make them his employees during the years 1963 and 1964. The testimony given during the trial is but a typical example of the modus operandi of the construction industry. Construction work is typically done on a bidding basis whereby a general contractor or builder oversees the project and divides the construction work into the necessary parts. The general contractor or builder divides the work up and offers it to subcontractors, who themselves may further divide up the work allocated to them to lesser subcontractors. This is the procedure followed by Kurio: he would take the responsibility for the final product, but delegated the actual work, in very distinct parts, to subcontractors. Kurio looked only to the end result, and was not concerned with the details or means by which the result was accomplished. In fact, the absence of control over the subcontractors was the reason for Kurio changing his method of operation in 1965, to an employer-employee relationship. It was this control which he sought and obtained by putting the drywall workers on his payroll.

During 1963 and 1964, the opportunity for profit or risk of loss from the operations of the drywall workers and haulers was in their hands alone. They decided whether they would do a job at a price Kurio was willing to pay and, once a job was undertaken, normal business efficiency and the attendant risks involved controlled the success or lack thereof they would experience from the venture. Kurio had no responsibility to the workers and haulers other than to pay the agreed price.

The drywall workers and haulers were experienced people who, Kurio determined, possessed the ability to perform the work in accordance with the terms of the contract. Kurio did not personally control or direct the manner in which the various jobs were performed, and he had no foreman or supervisors on the job who gave instructions or directions to the workers.

Each job was of comparatively short duration, and when a job was completed, the workers were free to accept a new job with another contractor—including one who might be in competition with Kurio. Permanency of relationship did not exist. See Rayhill v. United States, 364 F.2d 347, 354, 176 Ct.Cl. 1120 (1966). Furthermore, if plaintiff were dissatisfied with the work of one of his subcontractors, he simply did not offer him another job. This is not the equivalent of the right to hire or fire, but merely is evidence of the right not to enter into a contract. Ibid. The parties did not view their relationship as that of employer-employee, but as contractor-subcontractor.

 There is no support whatever either in fact or law for the position taken by the Government that the drywall workers, haulers or painters were Kurio's employees. The assessments made by the IRS and relied upon by the Government are clearly erroneous.

 In the event that I had found the drywall workers, haulers and painters to be employees of plaintiff during the years in issue, plaintiff asked that he be given credit for taxes paid during 1963 and 1964 by certain of the people who received payments from him. This issue is now moot. Because I have found all of these people not to have been "employees," plaintiff was exempt from the payment of FICA, FUTA, and withholding taxes during 1963 and 1964 as to these workers. Plaintiff does not owe the Government the penalties, called additions to taxes, for delinquency and failure to file a payroll tax return and make deposits of amounts withheld from wages. Plaintiff was not required to file payroll tax returns or to withhold any "wages." Plaintiff had good reasons for not filing payroll tax returns or making deposits of FICA or withholding taxes; his failure to do so was due to reasonable cause and not willful neglect.

 Kurio is not liable to the United States or any agency thereof for the assessments of payroll taxes, additions to taxes, or interest, for the periods and years 1963 and 1964. Any lien based thereon is null and void.

I turn now to the matter concerning the practical effect of and release of the lien created by the aforesaid assessment, notices of which have been filed in the public records of Harris County, and in particular, plaintiff's prayer that the court issue a mandatory injunction requiring that the liens be abated by the District Director of Internal Revenue Service and, that the Director be ordered to issue certificates of release. Although this part of plaintiff's prayer for relief was abandoned after the evidence was closed, plaintiff has indicated it may be renewed.

Section 6325(a) (1) of the Internal Revenue Code of 1954, 26 U.S.C. § 6325 (a) (1), provides that subject to such regulations as the Secretary of Treasury or his delegates may prescribe, a certificate of release of any lien may be issued if the Secretary or his delegate finds

that the liability for the amount assessed has become "legally unenforceable." The lien imposed upon Kurio can be lifted only as prescribed by section 6325. United States v. Heasley, 283 F.2d 422, 428 (8th Cir. 1960); Tomlinson v. Poller, 220 F.2d 308, 312 (5th Cir.), cert. denied, 350 U.S. 832, 76 S.Ct. 66, 100 L.Ed. 742 (1955); Metropolitan Life Ins. Co. v. United States, 107 F.2d 311, 313 (6th Cir. 1939), cert. denied, 310 U.S. 630, 60 S.Ct. 978, 84 L.Ed. 1400 (1940).

■ At the proper time, an abatement of the assessment and release of the lien could and might be ordered by the court pursuant to 28 U.S.C. § 1361. Section 1361 gives the district court jurisdiction of an action in the nature of mandamus to compel an officer of the United States or its agency to perform a duty owed the petitioner. But mandamus is an extraordinary remedial process which must be supported by evidence showing that the petitioner is entitled to such relief, and that a federal official has failed to perform a nondiscretionary, ministerial act owed the petitioner. See Prairie Band of Pottawatomie Tribe of Indians v. Udall, 355 F.2d 364 (10th Cir.), cert. denied, 385 U.S. 831, 87 S.Ct. 70, 17 L.Ed.2d 67 (1966). See Sprague Electric Co. v. Tax Court of United States, 230 F.Supp. 779 (D.Mass.1964), aff'd, 340 F.2d 947 (1st Cir. 1965). A "duty owed" implies that the officer must first be called upon to perform a duty he is required to do by statute. See 1962 U.S.Code Cong. and Adm.News, p. 2785. Applied to the case at hand, section 1361 requires the Government to release the lien after it has been determined finally to be legally unenforceable, but I construe section 1361 also to allow the District Director of the I.R.S. the opportunity and a reasonable time to act under the statute before the court should inter-

vene to mandate such action. This interpretation is in keeping with section 6325, whereunder the Secretary of the Treasury requires as a prerequisite to the issuance of a certificate of release of a tax lien, that a written application containing specific information be filed by the taxpayer.[12]

Language borrowed from the United States Supreme Court in another tax case, which illuminates the duty owed by the Government under appropriate circumstances is: "If that which the sovereign retains was unjustly taken in violation of its own statute, the withholding is wrongful. [T]he unjust detention is immoral and amounts in law to a fraud on the taxpayer's rights." Bull v. United States, 295 U.S. 247, 260, 261, 55 S.Ct. 695, 700, 79 L.Ed. 1421 (1935).

An outstanding lien of this sort can have a disastrous effect upon a small businessman such as Kurio. Kurio testified that a drywall contractor's business depends upon his ability to obtain a good line of credit from the companies that furnish him drywall and other materials. He stated that his line of credit has been reduced substantially because of the $89,000 tax lien. Kurio stated further that the existence of the lien has severely limited his ability to get contracts for the larger jobs—especially commercial jobs of the sort he has been striving for years to break into—due to the general contractor's fear that the Government would attempt collection of the lien while Kurio was in the process of completing the job, and thus impede or prevent his performance.

Although on April 21, 1967 the Government by way of stipulation reduced the maximum amount of claimed liability to $25,629.48, it is of limited practical benefit to plaintiff because the assess-

12. Treas.Reg. § 301.6325–1(b) (4) states: Any person desiring a certificate of discharge of property from a Federal tax lien shall submit to the district direc-tor * * * a written application in triplicate, under penalties of perjury, requesting that the certificate be issued.

ment and notice of lien have not been amended or reduced to reflect this reduced claim. The public records announce that plaintiff owes the Government almost four times the amount the Government is now actually claiming he owes. In this connection, it will be recalled that the Government has here relied solely on the presumption of validity of the assessment, offered no evidence to support such validity and that, although given full opportunity to do so, counsel did not submit any authorities or make an oral argument in support of the validity of the assessment.

■ If the Government fails to cancel the assessment and issue a certificate of release of the lien within a reasonable period of time after this judgment becomes final and after written request therefor by plaintiff, it would then be appropriate for him to institute legal proceedings to force such action pursuant to 28 U.S.C. § 1361 or 28 U.S.C. § 2410,[13] but not before then.

Now, therefore, it is hereby ordered that plaintiff recover the amount of $206.12 together with interest thereon as provided by 26 U.S.C. § 6611 and 28 U.S.C. § 2411; and, defendant's Counterclaim insofar as it demands judgment for taxes, additions to taxes, and interest in the amount of $89,063.56 is hereby dismissed with prejudice.

The Clerk shall file this Memorandum and Order, which constitutes the findings of fact, conclusions of law and a final judgment in the matter of plaintiff's claim for refund, pursuant to a separate order entered of even date, under the authority of Rule 54(b) of the Federal Rules of Civil Procedure, and mail true and correct copies to counsel of record.

13. Section 2410 provides, in part, that in actions or suits involving liens arising under the internal revenue laws, the United States may be named a party—for example in a suit to quiet title to real or property on which the United States has or claims a mortgage or other lien.

Once the tax or part of the assessment has been paid, the suit is no longer in the nature of an injunctive action. Compare Falik v. United States, 343 F.2d 38 (2d Cir. 1965). See also Comment 71 Yale L.J. 1329 (1962).