M. J. FLEEMAN t/a Ace Construction Co., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 33736.

United States District Court
N. D. Ohio, E. D.
Aug. 19, 1959.

Arthur L. Nebel, Canton, Ohio, Joseph J. Lyman, Washington, D. C., for plaintiff.

Russell E. Ake, U. S. Atty., Cleveland, Ohio, Chas. K. Rice, Asst. Atty. Gen., James P. Garland, Lyle M. Turner, Robert Livingston, Attys., Dept. of Justice, Washington, D. C., for defendant.

WEICK, District Judge.

This is a suit to recover $745.58 (plus interest) alleged to have been erroneously paid in Federal employment taxes for the years 1953 through 1955. The taxes in question were assessed under the Federal Insurance Contributors Act, 26 U.S. C. § 3101 et seq. and the Federal Unemployment Tax Act, 26 U.S.C. § 3301 et seq. They were paid on the earnings of certain installers or applicators doing work for the plaintiff over the period in question.

There is only one issue in the case—were the applicators employees of the plaintiff within the meaning of 26 U.S. C. § 3121(d) and § 3306(i) [formerly sections 1426(d) and 1607(i)]? [1]

The question is essentially one of fact. Only three fact witnesses testified, two applicators and the plaintiff.

The plaintiff was an individual engaged in the business of modernizing houses and other buildings, chiefly by means of the installation and application of home improvement materials, i. e., roofing, siding, etc. His principal area of business was in the Canton, Ohio, vicinity.

The contracts for the work were obtained by salesmen and submitted to the home office. Plaintiff himself was not qualified to do the work involved, and had no regular salaried personnel to do it.[2]

The actual work was done by the applicators, whose status is here in question.

Plaintiff had a list of applicators who had worked for him over the years. When a job came into the office, he would contact one of the applicators and in-

---

1. Section 3121 *"Definitions*
 \* \* \* \* \*

"(d) Employee.—For purposes of this chapter, the term 'employee' means
 \* \* \* \* \*

"(2) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee \* \* \*."

Section 3306 *"Definitions*
 \* \* \* \* \*

"(i) Employee.—For purposes of this chapter, the term 'employee' includes an officer of a corporation, but such term does not include—

"(1) any individual who, under the usual common law rules applicable in determining the employer-employee relationship has the status of an independent contractor, or

"(2) any individual (except an officer of a corporation) who is not an employee under such common law rules."

2. The only salaried personnel employed by plaintiff were a bookkeeper and a truck driver.

quire if he would like to take on the particular job. The applicators were free to accept or reject the offer, although they generally accepted. Plaintiff testified that if an applicator refused a job he would still be contacted for future work. This was borne out by the testimony of an applicator who had rejected a job offered him. By the same token, plaintiff had no agreement with any of the applicators obligating him to give them any work, and the selection was a matter of his own free choice.

Once the applicator was assigned to a job, he was given a work sheet which contained the name and address of the owner of the property to be improved and a general statement of the work to be done. He then proceeded to the home site. All necessary materials were purchased by plaintiff and delivered to the home site by plaintiff's truck driver. The applicator, however, supplied all of his own tools, equipment and transportation.

If more than one man was needed to do the job, the applicator would hire a helper, or get another applicator to work on the job with him. The rate of the helper's pay, or division of money among the applicators was a matter they themselves determined. The plaintiff had nothing to say on this question.

The applicators then proceeded to work. The actual work was done without any supervision on the part of plaintiff or his employees. Occasionally, plaintiff would go by a job to see how it was progressing, but that was the extent of his checking.

The applicators set their own hours, were under no deadline for any given job, and were only concerned with doing a good job as quickly as possible.

If any unusual circumstances arose making the job more difficult and/or costly, the applicator would check with the plaintiff before proceeding. However, they would do minor work, such as putting up shelves in a house, without consulting plaintiff.

The applicators were paid on a "per square" basis. A square is an area 10 feet by 10 feet. For each such area covered the applicator would receive a set amount. If added work was needed the extra pay to the applicator for doing it was negotiated between the applicator and plaintiff. The applicators could get an advance in pay equal to the amount of work they had completed at the time the advance was requested. Final payment was received only after the home owner had signed a completion slip.

Certain other facts were developed worth considering.

If a job was improperly done, the applicator responsible was expected to correct it without any added pay. If he was not available, another applicator would do the work and be paid for it.

For certain repair work, the job would be given on a bid basis. Several applicators would quote plaintiff a price for doing the job, and the lowest bid would get it.

At all jobs a sign would be put up stating that the work was being done by Ace Construction. If a person approached the applicator on the job about having similar work done, he was referred to Ace Construction. However, one of the applicators testified that he was not compelled to refer the inquiry, but apparently did so as a matter of business ethics.

The applicators did not work for plaintiff exclusively, and many had worked for his competitors when plaintiff had no jobs for them.

Although the applicators furnished their own transportation, they were paid a higher "per square" rate the further away from metropolitan Canton the job site was located.

Certain jobs required "spiking". Spiking means to apply a few squares to a house before the full job is begun. When this situation arose, an applicator on another job would be requested to spike the new job. Generally, he did so. However, he was free to refuse to do so, and his refusal would not endanger his getting further work. The applicator

who spiked the new job did not necessarily get the complete job.

Plaintiff did not do business in the Canton area during the winter months. However, he had a similar operation in Macon, Georgia, and some of the applicators who worked for him in Canton went there to work for him during the winter. They were not required to do so, and came in order to have work during that period.

One fact was disputed. The Government sought to prove that defendant had discharged an applicator found drunk on a job. No competent evidence of the fact was produced. However, plaintiff testified that if he did find a man drunk on the job he would request him to leave.

Many other minor facts were brought out, but they add little to the overall picture.

It is my conclusion, on the facts set forth, that the applicators were independent contractors and not employees within the meaning of the statute.

This conclusion is strengthened by a reading of the applicable Treasury regulation which states that an employer-employee relationship exists:

"* * * when the person for whom the services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done." Treasury Regulations on Employment Taxes (1954 Code) § 31.3121(d)–1.

From the facts stated it is clear that plaintiff did not have the right of control and direction called for in the regulation.

The same holding, on similar facts, has been entered in the following cases: Levin v. Manning, D.C.N.J.1952, 124 F. Supp. 192; Metropolitan Roofing & Modernizing Co. v. United States, D.C.Mass. 1954, 125 F.Supp. 670; Silver v. United States, D.C.N.D.N.Y.1954, 131 F.Supp. 209; Farm & Home Modernization Corp. v. United States, D.C.N.D.N.Y.1956, 138 F.Supp. 423; Millard's Inc. v. United States, D.C.N.J.1956, 146 F.Supp. 385; Jagolinzer v. United States, D.C.R.I. 1957, 150 F.Supp. 489; Zipley v. United States, D.C.E.D.Pa.1957, 156 F.Supp. 141; Edwards v. United States, Ct.Cl. 1958, 168 F.Supp. 955; Consolidated Housecraft, Inc. v. United States, D.C. E.D.N.Y.1959, 170 F.Supp. 842; American Homes of New England, Inc. v. United States, D.C.Mass.1959, 173 F.Supp. 857; Thor Co. v. United States, D.C. Mass.1959, 173 F.Supp. 65; see also United States v. Silk and Harrison v. Greyvan Lines Inc., 1947, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757.

This memorandum is adopted as findings of fact and conclusions of law. Judgment may be entered for plaintiff in an amount to be computed by defendant and with interest as provided by law.