**WILLIAM C. McCOMBS COMPANY, Inc.**

v.

**The UNITED STATES.**

No. 300–66.

United States Court of Claims.

Jan. 22, 1971.

Joseph J. Lyman, Washington, D.C., attorney of record for plaintiff.

Philip R. Miller, Washington, D.C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant; Norman J. Hoffman, Washington, D.C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

OPINION

NICHOLS, Judge.*

This is a suit by William C. McCombs Company, Inc., to recover taxes paid on the earnings of certain persons called "applicators" who performed services for the plaintiff. The plaintiff charges that the taxes were paid in error under the Federal Insurance Contributions Act (FICA), 26 U.S.C. § 3100 et seq., and the Federal Unemployment Tax Act (FUTA), 26 U.S.C. § 3300 et seq.

Plaintiff conducts a "home improvement" business. The issue is whether the "applicators" are independent contractors or employees. This issue, on generally similar facts, has been before this court several times before. Powers v. United States, 424 F.2d 593, 191 Ct. Cl. 762 (1970); Rayhill v. United States, 364 F.2d 347, 176 Ct.Cl. 1120 (1966); Illinois Tri-Seal Prods. Inc. v. United States, 353 F.2d 216, 173 Ct.Cl. 499 (1965); Edwards v. United States, 168 F.Supp. 955, 144 Ct.Cl. 158 (1958). These four cases were all decided in favor of the plaintiff. Counsel for the defendant has referred us to Ben Construction Corp. v. United States, 312 F. 2d 781, 160 Ct.Cl. 604 (1963) holding for defendant. However, we think *stare decisis* was fundamental to the decision in that case and somewhat undermines its value as a precedent in this court. We followed a District Court decision 139 F.Supp. 883 (1956) *affirmed per curiam,* 241 F.2d 127 (2d Cir.1957), involving the same taxpayer in prior years, and our inquiry mostly was limit-

* This case was referred to Commissioner C. Murray Bernhardt for findings of fact and recommendation for a conclusion of law pursuant to Rule 134(h). Although not in agreement with his conclusions, the court acknowledges the assistance derived from the commissioner's able report.

ed to the question whether changes in the employment situation had occurred.

The problem here is stated in Illinois Tri-Seal, *supra*, 353 F.2d at 223, 173 Ct. Cl. at 510.

> \* \* \* to determine, on the basis of the \* \* \* facts, whether or not the [applicators] were employees within the meaning of sections 3121(d)(2) and 3306(i) of the 1954 Code, both of which "specifically adopt the common-law test for ascertaining the existence of the employer-employee relationship."
>
> \* \* \* \* \* \*

Our trial commissioner concluded that "neither the specific facts of the case, nor the total situation, differs to any significant extent from those in \* \* \* *Rayhill*", and held that the applicators were not employees for purposes of the taxes in question. We disagree.

The plaintiff is a home improvement contractor and a substantial part of its business is applying new siding or roofing to the homes of its customers. To perform the actual labor, plaintiff utilized the services of siding mechanics, called applicators, who were compensated on a piece-work basis, e.g. a certain rate per square of siding applied. All contracts with applicators were oral and there was no guarantee of a definite number of jobs, "although they would sometimes be told that there was work throughout the year and that they would get work when it was available." There was no agreement preventing applicators from working for other contractors between jobs for plaintiff and some did. When a home improvement contract was obtained by one of plaintiff's salesmen, a description of the job and the work to be performed was enscribed on a worksheet in plaintiff's office. An applicator would come to the office, pick up a worksheet and proceed to the jobsite to perform the work. All materials were delivered to the jobsite by the plaintiff. Applicators were free to refuse a particular worksheet, although only rarely did

this occur, and it did not seem to jeopardize their being offered another at a subsequent time. There was no bidding for any particular job and the rate of compensation per square was constant, varying only with the type of material being used. There were occasions when work was to be performed out of town when an applicator would be paid for the cost of his room and board. The applicators might perform very minor related tasks for extra compensation but were required to correct faulty work without compensation.

Plaintiff's business signs were displayed at the jobsites indicating that McCombs Company was the contractor engaged by the homeowner.

The applicators generally owned their own trucks and tools which consisted of ladders, scaffolds, planks, pump jacks, power saws, hammers and brakes for forming aluminum sheets. The record is clear, however, that plaintiff did not hesitate to lend brakes or other equipment to any applicator who did not have his own.

Each applicator usually selected his own helper and determined how much the helper would receive. Both were paid every Friday by McCombs Company check based on the amount of work done and regardless of whether a job was complete.

Plaintiff kept a file of names of applicators on whom it could call. It also ran classified newspaper ads seeking qualified applicators.

The above recitation represents the general fact pattern common to all these cases. If there were nothing more we would have to agree that the result in *Rayhill* demanded a like result here. But we think *Rayhill* marks an outer limit in these cases, and we find incidents here which carry the case beyond. Complaisance in accepting the mere appearance of independent contractorship, disregarding the substance, would end in frustrating the policy of Congress and in excluding persons from the benefits

of Social Security coverage whom Congress meant to be covered.

In *Illinois Tri-Seal, supra,* we discussed at length the statutes, regulations and cases underlying the applicable law in this area. We see no need to repeat that analysis here. We concluded by listing the factors which determine whether or not a common-law relationship of employment exists. Although we noted that "no one factor is controlling" and "the relationship is to be ascertained by an over-all view of the entire situation", it is evident from our discussion there, and from our subsequent holding in *Rayhill,* that the degree of control exercised by the principal is the most significant of the factors listed. We said, 353 F.2d at 223, 173 Ct.Cl. at 510:

> * * *. It is, of course, fundamental that under the common-law test, the relationship of employer and employee exists where the principal has the right to direct the manner and method in which the work shall be done, as well as the result to be accomplished, while an independent contractor relationship exists where the individual who performs work for another does so according to his own manner and method, free from direction or right of direction in matters relating to the performance of the work save as to the result.
>
> *   *   *   *   *   *

In *Rayhill, supra,* we again called attention to the fundamental nature of the control factor and held, 364 F.2d at 354, 176 Ct.Cl. at 1129, "that plaintiff had the right under the arrangement to control only the result to be accomplished by the applicators and lacked the right to control the manner in which the work was to be performed." The opinion there is explicit in noting that, 364 F.2d at 354, 176 Ct.Cl. at 1130:

> * * * plaintiff *never* attempted to control or direct the manner in which the applicators did the work. Plaintiff had *no* foremen or supervisors to direct the applicators in the manner of doing the work. Other than being

expected to follow work sheet requirements of a kind usually contained in contract specifications so that the job would be accomplished in accordance therewith, the applicators received *no* instructions or directions from plaintiff as to the manner in which the work was to be done. (Emphasis supplied).

In *Illinois Tri-Seal,* 353 F.2d at 229–230, 173 Ct.Cl. at 520–521, we found that:

> * * * plaintiffs *never* attempted to control or direct the manner in which the installers did the work. Plaintiffs had *no* foremen or supervisors to direct the installers in the manner of doing the work and other than instructions contained in the work sheets—which the installers were expected to follow so that the work would be accomplished in accordance with the specifications contained therein—plaintiffs gave *no* directions or instructions to the installers concerning the manner or method of accomplishing the work. (Emphasis supplied.)
>
> *   *   *   *   *   *

There was a like finding in *Edwards, supra,* 168 F.Supp. at 956, 144 Ct.Cl. at 161:

> The plaintiff was not experienced in the manner and method of performing the work of applying roofing and siding materials, or in the installation of storm windows. He had *no* supervisors or other personnel to observe, instruct, or direct the applicators as the work progressed. He did *not,* personally undertake to supervise the work of the applicators, although he would occasionally visit a job. (Emphasis supplied.)

In the instant case, plaintiff employed salaried supervisors who would visit the job sites, with frequency being dependent upon the experience of the particular applicator. The purpose of these visits was found by the trial commissioner "to insure workmanlike performance and, if necessary, to instruct an applicator in certain techniques and procedures, such as overlapping aluminum channels,

caulking of seams, spacing of nails, etc." Implicit in this finding is the desire of the plaintiff to control not only the result but also the manner of achieving it. The type of instruction given by the supervisors seems rather fundamental to the whole process, and shows that plaintiff, although preferring experienced applicators, when available, was also training people who had no previous experience in this line of work. Several witnesses indicated they had done no applicating work before coming to McCombs. These witnesses also indicated they had to obtain their tools from McCombs with cost being deducted from their subsequent pay. One who must learn his trade and acquire his tools from the person employing his services can hardly be classified as an independent contractor. In *Rayhill*, it was specifically found that "plaintiff proffered work sheets *only* to experienced applicators who were deemed capable of performing the work." (Emphasis supplied.)

In the instant case also, there were occasions where plaintiff fired an applicator before completion of a job, either because of his personal conduct on the job site or because of what plaintiff considered faulty workmanship. In each of the precedent cases, there was a specific finding that *no* applicator was ever discharged during the progress of a job. In those cases, the *only* way in which the contractor terminated the services of an applicator was by refusing to offer further work sheets.

These distinctions alone might well be enough to weight the scales against the plaintiff in this instance, but there is more. In *Illinois Tri-Seal*, we said, 353 F.2d at 218, 173 Ct.Cl. at 502, "In close cases, such as these, the view of their own relationship which is taken and acted upon by the parties * * * is very significant." In that case, the fact that the "installers" as they were there called, paid their own self-employment taxes and otherwise acted as if they were self-employed was considered evidence that the parties did not see their own relationship as one of employer-employee. We are not concerned here, any more than we were in *Rayhill*, that plaintiff initially paid the taxes in question. But we do find other indicators that the plaintiff here looked upon the applicators as its employees. Indeed, the trial commissioner found that plaintiff desired a permanent arrangement with those it considered its "regulars" and the record indicates that it took certain steps to achieve it.

During a part of the time here under consideration, the applicators wore uniforms, supplied by McCombs, with McCombs Company advertising emblazoned thereon. Each applicator was furnished three such uniforms, paying only one-half the cost of laundering. McCombs also arranged with several of the applicators to display its advertising on their own trucks. This is a far step removed from the simple display of plaintiff's signs at the jobsite, which was characteristic of the other cases. It represents an effort on the part of McCombs to create the impression in the minds of its customers, its competitors, and the applicators themselves, that these men worked for it.

Plaintiff advertised in the classified sections of newspapers for qualified applicators. Its ads held out the promise of "steady employment", "good pay" and "company benefits". The record shows that plaintiff provided other work, such as carpentry or painting, for his regulars during periods when applicating might be slow. Plaintiff paid part of the premiums for those applicators who participated in the company's group health and group life insurance programs. In certain instances, some applicators received a lump sum bonus payment from the plaintiff. This bonus was usually referred to as vacation pay. All these circumstances are further indications that plaintiff looked upon these men as its employees.

The above distinctions, when looked at in light of the total situation, compel us to reverse the commissioner and dismiss the plaintiff's petition.

Neither party has referred us to Powers v. United States, *supra*, which held for the plaintiff and is the most recent case in point. However, we note that the defendant in that case took no exceptions to the commissioner's report and it was adopted by this court *per curiam* and without oral argument. Such a case might offer a problem if it constituted a precedent contrary to an approach we would deem sound in another case after full briefing and argument, if the matter were *res integra*. *Powers* does not pose such a difficulty here. We note that Chief Commissioner Bennett made a specific finding that "Plaintiff did not undertake actively to supervise the work of applicators. Having been satisfied prior to contracting with an applicator that he was qualified and experienced, plaintiff relied on his skill to perform the work properly * * * ". (Finding of Fact No. 19.) This seems to put *Powers* squarely in line with *Rayhill* and the other cited cases and certainly consistent with the distinctions raised here. The court, however, wonders why defendant did not save its rights in the *Powers* case, having decided to do so in the similar instant *McCombs* case especially in view of the breadth of defendant's arguments in the instant case. We do not subscribe to the idea that these cases do not bear on one another because they involve purely factual issues. Of necessity, the selection or rejection of underlying facts for use in arriving at ultimate conclusions of fact, must involve criteria which have precedential value and in effect are conclusions of law.

Counsel for defendant has urged the proposition that the Supreme Court in United States v. W. M. Webb, Inc., 397 U.S. 179, 90 S.Ct. 850, 25 L.Ed.2d 207 (1970), applied different standards for determination of the employment relationship than relied on by the commissioner, and proposes this as a ground of reversal. Without discussing that case, except to note that it involved maritime law and therefore is not directly apposite, we find nothing in it which in any way conflicts with the line of cases herein cited. We therefore reject the proposition that *Webb* compels reversal on grounds urged by defendant.

Defendant has taken various exceptions to the findings, which we deem it unnecessary to pass on, except for Finding 20, because defendant is entitled to recover on the findings as such, except Finding 20.

Accordingly, plaintiff is not entitled to recover and the petition is dismissed.

## FINDINGS OF FACT

The court having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and arguments of counsel, makes findings of fact as follows:

1. Plaintiff is a New York corporation conducting a home improvement business in and around Rochester, New York, since 1956. In the relevant taxable period of January 1, 1960 through March 31, 1964, more than half of the business consisted of the application of siding; one-fifth was roofing; the balance was storm windows, doors, gutters, downspouts, canopies, and related carpentry and stonework.

2. Plaintiff employed clerical help, repairmen, painters, a truckdriver and helper, and a supervisor. In addition, plaintiff engaged salesmen who were paid on a commission basis, and applicators of siding and roofing who were paid on a piece-work basis.

3. The sole issue is whether applicators should be classified as employees for purposes of the excise tax provisions of the Federal Insurance Contributions Act and the Federal Unemployment Tax Act. Plaintiff filed its return under these Acts, paid its taxes, was denied claims for refund for the relevant period, and filed a timely suit.

4. Plaintiff's salesmen contacted prospective homeowner customers, estimated the extent and cost of improvements, and negotiated contracts with them after obtaining plaintiff's approval of their credit. Based on the contracts,

worksheets were prepared, describing in detail the work to be done and the materials which plaintiff would deliver to the jobsite.

5. Applicators performed the work under the contracts. That consisted primarily in the installation of siding and roofing, but occasionally included incidental carpentry and installation of gutters and downspouts.

6. Plaintiff obtained its applicators either from a list of applicants and their employment forms on file, or from competitors, or as a result of classified newspaper advertisements which held out the prospect of steady work and fringe benefits. It preferred experienced and reliable men who did not require extensive instruction. Jobs would be parceled out to plaintiff's applicators according to the judgment of plaintiff's superintendent as to the individual's particular capability or preference. Some applicators specialized in particular materials, such as asbestos siding or aluminum siding. Sometimes the salesman for a job would request a particular applicator to be assigned to perform it. Applicators did not bid for particular jobs. Plaintiff's supervisor would visit the jobsites occasionally, particularly those jobs being performed by newly engaged applicators, to insure workmanlike performance and, if necessary, to instruct an applicator in certain techniques and procedures, such as overlapping aluminum channels, caulking of seams, spacing of nails, etc.

7. The worksheets referred to in finding 4 gave the customer's name, jobsite address, materials to be used, commencement and completion dates, and sometimes special instructions such as exercising care to protect shrubbery and lawns.

8. Applicators were free to, and in fact did, refuse work orders if they considered, before or after jobsite inspection, that the jobs were for example, too difficult, too distant, or involved the application of materials with which the particular applicator did not choose to work. Another worksheet would be offered to those who so refused. Refusals were the exception rather than the rule. Plaintiff usually attempted to offer applicators worksheets which conformed to their preferences, or at times induced acceptance of a difficult job by promising the applicator that it would be followed by others of a less difficult nature. A few applicators never refused worksheets. One applicator felt that his future jobs for the plaintiff would be jeopardized by such refusals.

9. With the exception of the worksheets, plaintiff's arrangements, including instructions and directions, to applicators, were oral. Additional instructions, combined with on site inspection, were most common during an applicator's initial jobs for the plaintiff. Once plaintiff was satisfied that applicators were proficient, their competence was relied on and jobsite supervision was occasional or infrequent, with no visits at all by plaintiff's personnel to some jobsites. Where visits were made, the plaintiff's representatives regularly checked for the presence of sufficient material, work scheduling, and whether the homeowner was pleased with the applicator's performance. In addition, criticisms and suggestions might be made regarding such aspects of the applicator's work as seams, corners, nailing of shingles, or requiring that faulty work be redone. Applicators rarely ignored the suggestions. An applicator might be asked to leave one job before completion and begin another elsewhere (termed "spiking"), but were not compelled to comply with such requests.

10. The plaintiff delivered all material necessary for application work to the jobsite, with the exception of gutter and downspout material. Applicators would charge for furnishing and installation of these latter items on a lineal foot basis in addition to the price received for applying roofing and siding materials.

11. Applicators supplied, maintained and replaced the bulk of their equipment

which would include trucks, ladders, scaffolds, planks, pump jacks, power saws, hammers, snips and assorted hand-tools, and sometimes brakes for forming aluminum sheets. While possession of tools was a prerequisite to obtaining a job with the plaintiff, plaintiff would lend its brakes to applicators on a regular basis if applicators did not possess their own. The plaintiff would occasionally lend high ladders or some other equipment to applicators. More often, plaintiff would allow an applicator to charge equipment to plaintiff's account at an equipment supply store, subtracting the purchase price of the equipment from future amounts due the applicator. On one occasion, an applicator charged the plaintiff with the rental cost of a high ladder.

12. The average time for job performance was one to two weeks, with some jobs lasting one month. Applicators decided the hours and the days of the week that they would work. They worked fairly steadily, spending normal work days on the jobsite. They took time off at will without informing plaintiff or obtaining its approval, both between and during jobs for the plaintiff.

13. (a) Applicators were paid on the basis of the number of squares (10′ x 10′) of siding and roofing material applied. The rate was usually constant and non-negotiated regardless of a job's difficulty, on the assumption that the more difficult jobs would be offset by easier ones. Rates would vary according to the type of material to be applied, and whether the job was for roofing or siding. Negotiation might take place for more difficult jobs if acceptance of flat rates could not be obtained, and for out-of-town jobs, which also might include reimbursement for room and board. Related additional work was very minor and pay for it varied between an hourly and a contractual basis, viz: cleanup following job performance would be paid for at either a per job or an hourly rate; payment for stone siding application, due to its difficulty, would be reimbursed on an hourly basis;

removing tiling and shingles, and application of felting would be paid according to the number of squares removed or applied; carpentry work would be reimbursed either on an hourly or contractual basis. Where a single individual performed carpentry work and only incidentally undertook application tasks, he was paid by the hour. Hourly payment also was made to the individual who worked with him. The status of these workmen is not in issue.

(b) Payment was made on Fridays based on the number of squares of material which the applicators reported on the preceding Wednesday to have applied, both for completed and unfinished jobs. Advances and partial payment would be made on request, and no payment was given if inclement weather had prevented applicators working.

14. Extra work, not contemplated by the work order or contract, was of minor importance. The general practice, and the one preferred by the plaintiff, was that it be notified to enable it to contract with the homeowner for the extra work. On occasion, however, applicators contracted with homeowners in their own names, or performed very minor additional work without pay. When the plaintiff was contacted, payment to the applicator for the extra work depended on the type of additional work which was performed. Applicators were responsible for correcting faulty work without compensation. This practice was generally followed. Leads for new contracts obtained by the applicators were expected to be, and in practice usually were, referred to the plaintiff.

15. Applicators worked alone or with associates and helpers of their own choosing. Without plaintiff's interference, applicators determined who, if anyone, they would team with or hire, what wage helpers would receive, and the scope of the helper's work. Plaintiff might attempt to help an applicator find a helper. Payment to the helpers was by check drawn to them by the plaintiff in an amount determined by the applicator and deducted from the total payment

due the applicator. Applicators also might work together with the same absence of interference by the plaintiff, with similar payment made to the individual applicators by check drawn on the plaintiff and subtracted from the total amount contracted for the job.

16. During the period in question more than 100 non-union applicators and helpers worked for the plaintiff applying roofing and siding. They were dealt with as "individuals on a job-to-job basis". Of this number no more than one-quarter could be considered "regulars" upon whom the plaintiff could depend, and who were assigned applicating work on a fairly steady basis. The regulars were favored recipients of plaintiff's job offers during the relatively slack winter months. No guarantees of a definite number of jobs or set period of continuous employment were made to the applicators by the plaintiff, although they would sometimes be told that there was work throughout the year and that they would get work when it was available. Many applicators worked for other roofing companies before and between jobs for the plaintiff, or on their own account. A few worked exclusively for the plaintiff for as long as several years, sometimes turning down offers of work from other companies. There was nothing in the plaintiff/applicator agreement which would prevent the applicators from working for others, although the plaintiff did not favor the regulars so working, (plaintiff appeared unconcerned about the non-regulars), and desired some permanency in the working relationship of the applicators. The plaintiff attempted to distribute the work among the applicators, allowing applicators to pick up a new worksheet at the conclusion of a prior job.

17. On isolated occasions the plaintiff terminated applicators while jobs were in progress for faulty work and for intoxication, and did not offer additional worksheets to applicators whose work was unsatisfactory, or (in one instance) with whom a controversy had arisen as to payment. Applicators would terminate their relationship with the plaintiff by refusing further worksheets or failing to seek additional assignments for varied reasons which included: dispute as to the sums owed them; objection as to kind of work being offered to them; broken promises as to plaintiff's agreement to pay for an applicator's vehicle insurance; or, for not receiving relatively easy assignments following the completion of a difficult job.

18. (a) The plaintiff placed ads in the classified pages of the telephone directory which stated in part, "Aluminum siding with laminated insulation board expertly applied * * *. All workmanship and materials fully guaranteed * * *."

(b) Signs advertising plaintiff's business were displayed at the jobsite. In a few instances applicators' trucks bore briefly signs or decals advertising the plaintiff company. Applicators would display such advertising on their trucks for several reasons, which included: plaintiff offered (but reneged) to pay an applicator's vehicle insurance; repainting an applicator's truck; payment to the applicator for the privilege. Signs were removed from applicators' trucks with a similar lack of pattern. An applicator, for example, might remove the plaintiff's sign from his truck if the plaintiff did not pay vehicle insurance as promised, or when an individual became an applicator, having previously been an hourly employee. The great majority of plaintiff's applicators did not have the plaintiff's name or sign on their trucks, some having their own names on their trucks. Individuals in the latter group were sometimes asked to remove their name, but refused.

(c) For a period of approximately one-half year, several applicators wore uniforms consisting of grey cotton trousers and work shirt. Sewn on the back of the shirt was a large semi-circular patch containing the wording, "Wm. C. McCombs Co. Inc. Roofing and Siding". The given name of the applicator was sewn in an oval patch above the right

shirt pocket. Applicators voted to wear the shirts, feeling that it would be cheaper than supplying their own clothing, as they paid only one-half the laundry cost, approximately $1.25 per week for three uniforms. Applicators might be requested to wear the shirts by the plaintiff to advertise the plaintiff's business. The wearing of the shirts, which was not a rigid rule, was objected to by several applicators, became unpopular and, within a matter of months of the plan's initiation, the shirts were abandoned.

(d) Applicators were given directions as to the responses expected to customer questions about their business relationship with the plaintiff. Answers were that they, in some manner, "worked for" or were "affiliated with" the plaintiff. Specific directions to tell the customer that they were, or were not, "employees", or that they were subcontractors, might be given as well.

19. When beginning jobs with the plaintiff, applicators might be told about various fringe benefits which could be had after a period of association with the plaintiff:

(a) A sum of money, usually called "vacation pay", was given to some applicators. This payment (realistically a bonus) would not be given if the applicator was considered "part-time", usually was not given until the applicator had done jobs for the plaintiff for one year, and might never be given to a particular applicator.

(b) After some time, ranging from three months to a year, some applicators were offered enrollment in a Blue Cross-Blue Shield medical and hospitalization insurance program. Partial premium payments were made by the plaintiff.

(c) Again, after as few as three months, but usually after one year, some applicators were offered group life insurance coverage. If offered and taken, plaintiff paid one-half of the applicator's premiums.

20. On the basis of the total situation the evidence establishes that plaintiff had the right to control the manner and method of the applicators' work performance, as well as the result accomplished by them.

### CONCLUSION OF LAW

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.