**TRISTATE DEVELOPERS, INC.**

v.

**The UNITED STATES.**

No. 439–72.

United States Court of Claims.

Jan. 26, 1977.

Joseph J. Lyman, Washington, D. C., attorney of record, for plaintiff.

Fenton P. Wilkinson, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Robert S. Watkins, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS and KASHIWA, Judges.

OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Lloyd Fletcher, filed October 21, 1975, pursuant to Rule 134(h), having been submitted and considered on the briefs and oral argument of counsel.

Like the earlier "applicator" cases, this case is controlled by the whole of its particular facts. The trial judge properly points out the significant differences from *William C. McCombs Co. v. United States,* 436 F.2d 979, 193 Ct.Cl. 644 (1971). The present case is more like *Rayhill v. United States,* 364 F.2d 347, 176 Ct.Cl. 1120 (1966) and *Powers v. United States,* 424 F.2d 593, 191 Ct.Cl. 762 (1970), and falls within the area marked out by those decisions; the differences from those cases which defendant cites are not significant in the light of the totality of the circumstances.

Since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, it is concluded the plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c) in accordance with this opinion. Defendant's counterclaim is dismissed.

OPINION OF TRIAL JUDGE

FLETCHER, Trial Judge: The issue in this case must bring to the court a resigned feeling of *déjà vu.* Once again, it is necessary to wrestle with the familiar common law distinction between an employee and an independent contractor, as the courts have done so many times before. Not that the legal principle is esoteric; far from it. In *Illinois Tri-Seal Products, Inc. v. United States,* 353 F.2d 216, 173 Ct.Cl. 499 (1965), the court has succinctly put the distinction, as follows, at 353 F.2d 223, 173 Ct.Cl. 510:

\* \* \* It is, of course, fundamental that under the common-law test, the rela-

tionship of employer and employee exists where the principal has the right to direct the manner and method in which the work shall be done, as well as the result to be accomplished, while an independent contractor relationship exists where the individual who performs work for another does so according to his own manner and method, free from direction or right of direction in matters relating to the performance of the work save as to the result.

For all employment tax purposes, the Internal Revenue Code and the Treasury Regulations promulgated thereunder have specifically adopted this common law test for ascertaining the existence of the employer-employee relationship, *Enochs v. Williams Packing Co.,* 370 U.S. 1, 3, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962), and the regulations rightly conclude that:

(3) Whether the relationship of employer and employee exists under the usual common law rules will in doubtful cases be determined upon an examination of the particular facts of each case. Treas.Reg. § 31.3121(d)–1.

Since the problem for the court, therefore, is basically factual, it is necessary to proceed with an elaboration of the facts adduced at the trial,[1] bearing in mind that the sole issue for decision is whether certain home siding and roofing "applicators" performing such work under contracts with plaintiff were its employees or were independent contractors.[2] If these several applicators were independent subcontractors for plaintiff (sometimes "Tristate"), then plaintiff is entitled to recover herein. On the other hand, if these persons were Tristate's employees, defendant is entitled to prevail on its counterclaim under the provisions of Sections 3101 *et seq.,* 3301 *et seq.,* and 3401 *et seq.* of the Internal Revenue Code of 1954. Upon the facts now to be described, I have concluded that the applicators who performed jobs for Tristate were not its employees but were independent contractors during the periods involved. Accordingly, judgment should be entered for plaintiff and the counterclaim dismissed.

The court is no stranger to the concept of "applicator" (sometimes also referred to as "installer" or "mechanic") as that term is used in the home improvement business and has dealt with it on no less than seven prior occasions. *Ralls, Inc. v. United States,* 470 F.2d 579, 200 Ct.Cl. 240 (1972); *William C. McCombs Co. v. United States,* 436 F.2d 979, 193 Ct.Cl. 644 (1971); *Powers v. United States,* 424 F.2d 593, 191 Ct.Cl. 762 (1970); *Rayhill v. United States,* 364 F.2d 347, 176 Ct.Cl. 1120 (1966); *Illinois Tri-Seal Prods. Inc. v. United States,* 353 F.2d 216, 173 Ct.Cl. 499 (1965); *Edwards v. United States,* 168 F.Supp. 955, 144 Ct.Cl. 158 (1958); and *Ben Construction Corp. v. United States,* 312 F.2d 781, 160 Ct.Cl. 604 (1963). Nor has judicial consideration of applicators' employment status been confined to the Court of Claims. *See,* for example, *Alsco Storm Windows, Inc. v. United States,* 311 F.2d 341 (9th Cir., 1962); *Ben v. United States,* 139 F.Supp. 883, aff'd. 241 F.2d 127 (2d Cir., 1957); *Hoosier Home Improvement Co. v. United States,* 350 F.2d 640 (7th Cir., 1965); *Consolidated Housecraft, Inc. v. United States,* 170 F.Supp. 842 (E.D., N.Y., 1959); *Jagolinzer v. United States,* 150 F.Supp. 489 (D.R.I., 1957); *Security Roofing and Const. Co. v. United States,* 163 F.Supp. 794 (D.Mass., 1958); *Fleeman v. United States,* 175 F.Supp. 336 (N.D.Ohio, 1959); *Zipley v. United States,* 156 F.Supp. 141 (E.D., Pa., 1957); and *Drake v. United States,* 75–1 USTC ¶ 9475 (N.D.Tex., 1975). Despite generally similar fact patterns there has not been unanimity of result in these many

---

1. The detailed facts of the case are set forth in the findings of fact below. They will be summarized here only to the extent necessary to explain the basis for decision.

2. Plaintiff has also utilized the services of other individuals whose status originally was, but no longer is, controverted. Its bookkeeper-secretary, telephone solicitors, and expediters have now been conceded by Tristate to be its employees. In turn, the Government no longer contends for employee status of plaintiff's commission-salesmen and stone applicators.

cases.[3] They have been referred to, however, because in *McCombs, supra,* the court has observed that:

> * * * We do not subscribe to the idea that these cases do not bear on one another because they involve purely factual issues. Of necessity, the selection or rejection of underlying facts for use in arriving at ultimate conclusions of fact, must involve criteria which have precedential value and in effect are conclusions of law. 436 F.2d 983, 193 Ct.Cl. 652–53.

Following a factual pattern generally similar to all these cases, the record here shows that Tristate is a home improvement contractor, a substantial part of whose business is the installation of new siding or roofing to the homes of its customers. During the periods at issue, this business was conducted under the supervision of Tristate's general manager, Ben Abramson, who utilized the services of commissioned salesmen to obtain contracts from customers and applicators to do the labor (and sometimes furnish the materials) necessary to the performance of those contracts. He acquired the services of these applicators in several ways. Their names were sometimes obtained by plaintiff from wholesale materials supply houses where applicators customarily made known their availability to the trade generally. From previous experience with them plaintiff also kept a list of names of several qualified applicators whom it would call when needed. Others came to plaintiff's office by word of mouth from other applicators who had worked for plaintiff. Also, plaintiff inserted advertisements in the classified sections of newspapers for applicators, stating: "Wanted experienced siding applicators. Steady work. Good pay." Also, a few applicators advertised in the "yellow pages" of the telephone directory.

As customer contracts were obtained, the specifications therein were transferred to a work order which authorized not only the work to be done and the materials to be used but also the price to be paid by any applicator who accepted the work order. Occasionally, starting and completion dates might also be stated, but generally the timing of work performance was left to the applicator subject to overall concern for customer satisfaction.

There was no competitive bidding, and any applicator deemed by plaintiff to be sufficiently experienced was free to accept any particular work order.[4] Some amount of bargaining as to price for the work took place, particularly where the job was unusual or fairly complex. Tristate's general position was that it should have to pay no more than prevailing area rates and it maintained a price list reflecting them which list price generally prevailed. However, in negotiating prices, Abramson took a more flexible attitude when applicators were in short supply or when, because of prior experience, he wanted the services of a particular applicator who had done good work for plaintiff in the past. The end result of this procedure was that some applicators received one price and others received a different price for the same type of work.

The applicators were free to accept work orders of a similar kind offered by plaintiff's competitors and they would do so except in the case of a few applicators who preferred to work exclusively for Tristate. All applicators, in addition to experience requirements, had to furnish all necessary tools and equipment for the performance of the job, and each had his own truck or other form of transportation which was maintained without reimbursement or other payment by Tristate.[5] Some occasionally fur-

---

3. Although on a "nose-count" approach, most of the decisions arrive at a conclusion of independent contractor status for applicators.

4. It was also understood that interested applicators were free to reject any proffered work order, and although such refusals were rare, they did not prejudice the rejecting applicator from being offered subsequent work orders.

5. Tristate owned no trucks or tools other than (for a short period) a brake for forming aluminum which a few applicators used occasionally.

nished the necessary materials but most of the time the materials were supplied and delivered to the job by Tristate. Some of the applicators were independent licensed contractors. They employed and paid their own helpers. Final payment by Tristate to an applicator for a particular job was made only upon completion of the job and the furnishing by the applicator of a completion certificate signed by the home owner. Tristate, however, would make various advance payments to applicators generally on Friday for work accomplished during the week.

Tristate did not actively supervise the applicators but depended upon their experience to satisfy the customer and comply with the specifications of the work order.[6] While Tristate had no foremen or supervisors, as those terms are generally understood, it did not on several occasions employ as many as two persons known as "expediters" who would visit jobs in progress from time to time, the frequency of their visits depending upon the nature and number of any customer complaints and the company's prior experience with a particular applicator. As the name suggests, their job essentially was to see to it that satisfactory progress was being made by the applicators in completing their respective jobs. They also conveyed customer complaints to the applicators, and on their own initiative would sometimes criticize work which they considered to have been poorly done. They also collected money from customers.

Plaintiff owned signs which advertised its business with the slogan "A New Home at an Old Address by Tri-State Developers". These signs were placed at some but not all jobsites. Plaintiff asked the applicators to post these signs, and sometimes they did. At other times, the salesmen would post the signs on the customer's property. For a period of about six weeks, one applicator and his helper wore uniforms with plaintiff's name on them. This shortlived effort at advertising was suggested by the applicator but was aborted due to cleaning and other difficulties. The applicators' trucks carried no sign or other insignia identifying them in any way with Tristate Developers, Inc.

Mechanics sometimes worked for plaintiff in the capacity of ordinary manual laborers. On rainy days and during slack periods some would work at an hourly rate of pay in plaintiff's warehouse unloading materials from delivery trucks or delivering materials to jobsites. One mechanic would sometimes repair the work of another mechanic when a service call was necessary, and a charge would be made for such service call by the mechanic making the repair. Plaintiff tried to charge this cost back to the original mechanic if possible.

A few mechanics represented themselves to the customer as either an employee of plaintiff or as the "foreman" of the job. One mechanic, who was obviously hostile to plaintiff, testified that he was told by plaintiff not to tell customers that he was a subcontractor. He expressed the opinion that he was plaintiff's employee but freely admitted that he frequently left a job at mid-day and spent the afternoon drinking in a bar because he didn't think such absence from the job "was any of the company's concern". By way of contrast to these few instances, the record in this case demonstrates that the reliable and experienced applicators who performed jobs for plaintiff felt that they were in business for themselves.

This summary of Tristate's relationship to its applicators, expanded at length in the findings below, discloses a general fact pattern common to all cases in which applicators have been held to have independent contractor status. *See,* for example, *Rayhill v. United States, supra; Powers v. United States, supra;* and *Ralls, Inc. v. United States, supra.* It would seem, therefore, that a like result is demanded here.

Defendant, however, contends vigorously that the present case is completely controlled by *William C. McCombs v. United*

---

**6.** Any faulty work had to be corrected by the applicator to the customer's satisfaction without further compensation.

*States, supra,* in which the court held that, on its particular facts, the case had passed the outer limits established by *Rayhill* and like cases to such an extent as to require a finding of employer-employee status. But this effort to equate the facts in *McCombs* with those in the present case fails wholly to discern the significant differences between the two cases.

Probably the most salient of the numerous differences is the court's finding in *McCombs* that the home improvement contractor there had employed salaried supervisors who would visit the jobsites "to insure workmanlike performance and, if necessary, *to instruct* an applicator *in certain techniques and procedures,* such as overlapping aluminum channels, caulking of seams, spacing of nails, etc." 436 F.2d 984, 193 Ct.Cl. 654, finding 6. [Emphasis supplied.] Concerning this finding the court said:

> * * * Implicit in this finding is the desire of the plaintiff to control not only the result but also the manner of achieving it. The type of instruction given by the supervisors seems rather fundamental to the whole process, and shows that plaintiff, although preferring experienced applicators, when available, was also training people who had no previous experience in this line of work. Several witnesses indicated they had done no applicating work before coming to McCombs. These witnesses also indicated they had to obtain their tools from McCombs with cost being deducted from their subsequent pay. One who must learn his trade and acquire his tools from the person employing his services can hardly be classified as an independent contractor. 436 F.2d 982, 193 Ct.Cl. 650.

No comparable situation existed in the present case. In contrast, just as in *Rayhill,* Tristate offered work orders only to experienced applicators who were deemed capable of performing the work even though, as might be expected in any subcontractor relationship, some applicators were more skilled and competent than others. Unlike their own helper-employees, these men needed no instruction or supervision in the performance of their work orders, and in fact knew much more about the techniques involved than Abramson himself who never visited a job-site. To him the important consideration was the applicator's experience and the absence of customer complaints. Even after he had hired expediters, it was understood that their basic functions were to remedy problems of uncollected bills and complaints over poor workmanship, to assess problems (such as undetected rot) which arose during a job, to arrange bank financing for customers, to verify the amount of materials needed, and generally to keep the jobs moving to an expeditious conclusion. Although they sometimes suggested to a mechanic that he should caulk more around windows or straighten a bent aluminum panel, their function was not to *instruct* an applicator in certain techniques and procedures, such as overlapping aluminum channels, caulking of seams, spacing of nails, etc., as was done by the McCombs Co. supervisors. The expediters did not teach Tristate's mechanics their trade. Their work served to improve customer relations, to avert probable customer complaints about things which their prior experience as applicators gave them reason to anticipate, and in general to contribute to efficient functioning of the company through obviating time-consuming and expensive corrections. Thus, their function more closely resembles that of the contractor's representatives in *Powers* than that of the supervisors in *McCombs. See* finding 19 in *Powers v. United States, supra,* at 424 F.2d 593, 191 Ct.Cl. 783. Further, Tristate's applicators furnished their own tools.

Another fact which moved the *McCombs'* applicators from the more typical subcontractor pattern into employee status was that the contractor there could fire an applicator for cause before completion of the job. This right existed and was exercised in *Powers,* too, but the court's opinion observed that "plaintiff's actions toward this applicator [who got drunk, suffered an injury, and failed to show up for work] were not those of an employer discharging an employee. Rather, they were a manifestation of the right of a general contractor to

declare that his sub-contract had been breached by the subcontractor." *Powers v. United States, supra,* at 424 F.2d 598, 191 Ct.Cl. 771. As in *Powers,* Tristate had discharged one applicator during a job without permitting him to finish, but this incident also occurred in the atmosphere of a contractor's right to terminate his subcontractor for unsatisfactory performance of the contract. Usually Tristate permitted applicators to complete a job and, if dissatisfied with his work, simply did not offer him further work orders in the future.

Tristate's situation is further dissimilar from the plaintiff's in the *McCombs* case because of the absence of a mutual intent to establish or perpetuate an employee relationship. Tristate did wish to compile a list of experienced "regulars" on whom it could rely for dependable work, but even these "regulars" felt no obligation to make themselves constantly available to Tristate, and some freely accepted applicator jobs elsewhere.

Other crucial dissimilarities show the inapplicability of *McCombs* to the present case. In the area of representation to the public at large, for example, *McCombs* furnished three uniforms to its applicators "with McCombs Company advertising emblazoned thereon" and paid one-half the laundering cost. In addition, *McCombs* arranged to display advertising on the trucks of several applicators. 436 F.2d 979, 193 Ct.Cl. 651. No such efforts were made by Tristate to create a public impression that the applicators were its employees. To the contrary, it restricted this type of advertising to a simple display of its signs at the jobsite,[7] which was characteristic of the prior cases.

Further, *McCombs* paid part of the premiums for those applicators who participated in the company's group health and group life insurance programs and, in some instances, paid applicators lump sum bonuses as vacation pay. All these are clearly indicative of employer-employee status, but Tristate did none of these things. It did carry public liability and property damage insurance to protect itself against claims for damages and injuries caused by the applicators, but this type of insurance coverage in no way negates a contractor-subcontractor relationship. *See Rayhill, supra,* 364 F.2d 347, 176 Ct.Cl. at 1127.

In contrast to the factual situation in *McCombs,* it is also important to observe that the Tristate applicators, once they received a work order, were free to perform the work with partners or helpers of their own choosing. Tristate had no control, and did not attempt to exercise control, over an applicator's selection of such co-workers,[8] and this clearly indicates lack of control over the methods and details of performing the work. Tristate issued its payment checks only to the primary applicator and never to one of his helpers, although on rare occasions Tristate might issue checks to each applicator when working in partnership.

From a consideration of all these factors, one finally returns to the ultimate question of "right to control" which must always govern the outcome of these cases involving the distinction between an "employee" and an "independent contractor". Many years ago, Judge Learned Hand described the question in his typically pungent way as follows:

\* \* \* The test lies in the degree to which the principal may intervene to control the details of the agent's performance; and that in the end is all that can be said, though the regulation redundantly elaborated it. In the case at bar the plaintiff did intervene to some degree; but so does a general building contractor

---

7. With one exception. At the suggestion of one of its applicators, he and his helper obtained uniforms at their own cost with Tristate's name printed thereon. After several weeks, the practice was abandoned.

8. At times, Abramson expressed dissatisfaction with a particular helper's appearance, language, or work habits which might be offensive to Tristate's customers, but he did not consider that he had the power to fire such helper. He could withhold further work orders from the applicator involved.

intervene in the work of his subcontractors. He decides how the different parts of the work must be timed, and how they shall be fitted together; if he finds it desirable to cut out this or that from the specifications, he does so. Some such supervision is inherent in any joint undertaking, and does not make the contributing contractors employees. *Radio City Music Hall Corp. v. United States,* 135 F.2d 715, 717–18 (2d Cir., 1943).

Those graceful observations might well have been made with respect to the factual pattern of the present case.

Upon careful consideration of the entire record and its significant dissimilarities from the *McCombs* record, it is concluded that while plaintiff retained the right at all times to control the result of the work contracted for, and on which applicators were used, plaintiff did not exercise direction and control over the manner and method of the applicators' work performance, nor did it retain the right to do so. Accordingly, under the authority of the seven applicator cases previously decided by the court and cited above, plaintiff is entitled to recover and defendant's counterclaim must be dismissed. From the figures contained in finding 32 below, it seems apparent that the total amount of plaintiff's recovery should be $2,898.60, plus interest thereon as provided by law. However, in the absence of an agreement by the parties to that effect, it seems appropriate to reserve a final determination of the exact amount of recovery for further proceedings under Rule 131(c).

**MAJOR COAT COMPANY, INC.**

v.

**The UNITED STATES.**

No. 31–72.

United States Court of Claims.

Feb. 4, 1977.

Theodore M. Kostos, Philadelphia, Pa., atty. of record, for plaintiff; Stassen, Kostos & Mason, Philadelphia, Pa., of counsel.

Raymond B. Benzinger, Washington, D. C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D. C., for defendant; Donald W. Crockett, Washington, D. C., of counsel.

Before DAVIS, Judge Presiding, LARAMORE, Senior Judge, and BENNETT, Judge.

**ORDER**

This case comes before the court on defendant's motion, filed December 3, 1976, for rehearing *en banc* pursuant to Rules 7(d) and 151. Upon consideration thereof, together with the response in opposition